The **UNITED STATES of America,**
**Plaintiff-Appellant,**

v.

The **RUSSELL MANUFACTURING COMPANY, Defendant-Appellee.**

No. 313, Docket 29116.

United States Court of Appeals
Second Circuit.

Argued April 30, 1965.

Decided July 7, 1965.

---

15. Cf. Estes v. State of Texas, 85 S.Ct. 1628 (June 7, 1965).

J. Edward Shillingburg, Washington, D. C. (Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Harry Baum, Attys., Dept. of Justice, Washington, D. C., Jon O. Newman, U. S. Atty., Howard T. Owens, Jr., Asst. U. S. Atty., of counsel), for plaintiff-appellant.

John D. Fassett, New Haven, Conn. (Wiggin & Dana, Charles C. Kingsley, New Haven, Conn., on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, and FRIENDLY and MARSHALL, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal is the latest chapter in a tax controversy between the Government and Russell Manufacturing Company which has been dragging on for nearly twenty years. We think, as did Judge Timbers in the District Court for Connecticut, it is time to bring down the curtain.

During the years 1942 through 1948, Russell entered into sixteen trust agreements, known as A through P, by each of which it agreed to deposit with a trust company a specified proportion of its earnings for a fiscal year. Each trust was for the benefit of officers and key management personnel whose names and participating percentages were set forth in a schedule. The trustee was to invest the payments in United States bonds and to distribute the interest currently among the participants. It appears that for ten of the trusts, beginning two years from the end of the fiscal year in respect of whose earnings the payments were to be made, the principal was to accrue to the beneficiaries at the rate of $\frac{1}{36}$ thereof per month; payments of $\frac{1}{3}$ of the principal were to be made at the end of the third year and of the two succeeding ones. For the other six trusts, accrual began immediately upon the end of the fiscal year for which earnings were paid over, but the accrual rate was $\frac{1}{60}$ per month and $\frac{1}{5}$ of the principal was to be paid after this first accrual year ended and for four successive years. A beneficiary who voluntarily left Russell's employ before the accrual began lost all rights, unless he left for ill health and did not engage in any business or manufacturing activity. After accrual began, a beneficiary who left Russell's employ otherwise than by discharge or requested resignation would

likewise forfeit any unaccrued share if he engaged in any such activity. All amounts so forfeited were to be added pro rata to the shares of the other beneficiaries.

Payments to the trusts began in 1942. Controversy over their tax consequences commenced with the tax for the fiscal year 1945. Russell took as a deduction in that year $47,200 paid to trusts F and G. The Commissioner disallowed this on the ground that the payments were not pursuant to a "qualified" plan under § 23(p) (1) (A), (B) and (C) of the 1939 Code, as Russell conceded, and that they did not meet the requirement of § 23(p) (1) (D) which permits deductions of payments under a non-qualified plan "if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid." Payment of the deficiency, denial of a refund claim, and suit in the Court of Claims ensued.

In Russell Mfg. Co. v. United States, 175 F.Supp. 159 (1959), the Court of Claims sustained the Government's position that § 23(p) (1) (D) was not satisfied merely because the rights of the beneficiaries were nonforfeitable as a group. It held, in consequence, that amounts paid by Russell to the trustee in 1945 were not deductible in that year. But it construed § 23(p) (1), contrary to the applicable Treasury Regulation, Treas.Reg. 111, § 29.23(p)-11, as amended T.D. 5666, 1948-2 Cum.Bull. 46, six years after, enactment of the relevant statute, as permitting deduction of amounts paid by the trustee to the beneficiaries in 1945 on the basis that these constituted "compensation * * * paid * * * on account of any employee under a plan deferring the receipt of such compensation" under the introductory language of § 23(p) (1) and met the test of subsection (D) permitting the deduction "in the taxable year when paid" since the beneficiaries' interest had become nonforfeitable at that time.[1]

The Internal Revenue Service announced that it would not follow the decision insofar as this was favorable to the taxpayer. Rev.Rul. 59–383, 1959 —2 Cum.Bull. 456. Later the Assistant Attorney General in charge of the Tax Division advised the Chief Counsel of the Internal Revenue Service, the attorney for Russell, and the Clerk of the Court of Claims that the Department of Justice had decided against petitioning for certiorari.

Meanwhile refund claims for the years 1946–54 had been accumulating and the District Director of Internal Revenue sought advice from the National Office as to what to do about them. In January, 1960, the Chief Counsel of the Internal Revenue Service instructed, in a letter of which more hereafter, that, assuming there had been "no fundamental changes in the factual situation in the years referred to in your memorandum, an administrative refund should be made to the taxpayer, limited of course to the issue lost by the Government" in the Court of Claims. Accordingly, the District Director made refunds, first in February, 1961, for payments under Trusts B, C, D, E, F, G, I and L during 1946–49, and then in November, 1961, for payments under Trusts D–P inclusive for 1950–54. On November 1, 1963, the United States brought this action to recover the refunds for payments under Trusts H–P inclusive for 1950–54 as erroneously made, Internal Revenue Code of 1954, § 7405(b).[2] Earlier, on April 5, 1963, the Court of Claims had

1. Apparently such payments were made in the fiscal year 1945 only under Trust C, covering 1943 earnings with first payment after a one year delay. The two prior trusts—A (1942) and B (1943)—made first payment only after three years expired, so nothing was payable during 1945.

2. Action to recover the February, 1961, refunds was then barred by the two-year statute of limitations of § 6532(b). The record does not inform us why the complaint did not include refunds for 1950–54 under Trusts D, E, F, and G; the involvement of these trusts in the Court of Claims litigation may supply an answer, see infra.

declined an invitation by the Government to overrule its Russell decision, Mississippi River Fuel Corp. v. United States, 314 F.2d 953, 161 Ct.Cl. 237, and the Solicitor General had decided not to apply for certiorari.

■ Both parties to this action having moved for summary judgment, Judge Timbers granted Russell's motion on the three grounds that the suit was not one to recover a tax "erroneously refunded" within the meaning of § 7405(b), that the Court of Claims' decisions should be followed on the principle of *stare decisis*, and that he would independently have reached the same conclusion. We affirm for the first reason, although, as our discussion will show, the two other considerations are not unrelated.

The Government candidly tells us that its "corrective efforts in the instant case are animated by far more than a contest over the stakes involved in this lawsuit." Its aim is to obtain a decision by this court conflicting with that of the Court of Claims, as to which Russell might well obtain certiorari under Supreme Court Rule 19, subd. 1(b), and thus to procure an authoritative construction, hopefully in the Government's favor. However commendable this determined effort to protect the revenue may be, it is not hard to understand why Russell does not share the Government's zest for further litigation of a matter it had every reason to consider ended in 1961.

■ The Government points out that § 7405(b), like its ancestor, § 610 of the Revenue Act of 1928, 45 Stat. 875, "does not grant the Government a new right" but, by virtue of the two-year period for suit, now prescribed in § 6532, "is a limitation of the Government's long-established right to sue for money wrongfully or erroneously paid from the public treasury." United States v. Wurts, 303 U.S. 414, 416, 58 S.Ct. 637, 638, 82 L.Ed. 932 (1938). True as this is, it does not solve the problem; in fact, by taking us behind the statutory words, which could be read as literally covering the case, to the legal principle underlying them, it may hurt the Government rather than help. An action to recover a tax refund is an action for restitution, and the plaintiff in such an action can prevail only by showing an affirmative ground that will move the conscience of the court. As Judge Hutcheson said many years ago, the Government must show that the taxpayer "has money which, *ex aequo et bono,* it ought not to retain." Houston Prod. Co. v. United States, 4 F.Supp. 715, 718 (S.D.Tex.1933).

■ The rule of Bilbie v. Lumley, 2 East 469, 102 Eng.Rep. 448 (K.B.1802), as adopted in a more limited form in Restatement, Restitution § 45 (1937), is that "a person who, induced thereto solely by a mistake of law, has conferred a benefit upon another to satisfy in whole or in part an honest claim of the other to the performance given, is not entitled to restitution." That general rule, however, is subject to exceptions, one of which is that "a person who has conferred a benefit upon another because of an erroneous belief induced by a mistake of law that he is under a duty so to do, is entitled to restitution as though the mistake were one of fact," when the benefit is conferred by a state. Restatement, supra, § 46(a); Wisconsin Cent. R. R. v. United States, 164 U.S. 190, 210, 17 S.Ct. 45, 41 L.Ed. 399 (1896); United States v. Dempsey, 104 F. 197 (C.C.D. Mont.1900). Yet this still does not settle the issue in the Government's favor; we are left with the question whether the refunds to Russell were made under a "mistake" of any sort.

Simple reading of the tax statute does not demonstrate that the payments to the beneficiaries were not deductible; indeed, as said in Judge Davis' perceptive concurrence in the Mississippi River case, 314 F.2d at 958, "By design or inadvertence, the bare language of Section 23(p) seems to fit snugly" with the view that they were. No judicial decision now extant holds or even indicates that the payments were not proper deduc-

tions.[3] The "mistake" on which the Government principally relies for relief thus is not a departure from the statute which a lawyer could discern from the text or decisions construing it; the refunds will prove to have been made by "mistake" only if the legislative history the Government has assembled and other considerations it has advanced—largely argued and all available to the Court of Claims—should persuade this court to disagree with the only judicial interpretation—and this by no means an unreasonable one—that now exists.

The Government was not required to swallow the Court of Claims' decisions but could have sought certiorari; instead, both in Russell and in Mississippi River, it declined the gambit.[4] Although this was an entirely permissible choice for the Government's law officers, the consequences should not fall on this taxpayer, who in good faith accepted the refunds which the Government proffered and which, had the Government refused, it could readily have obtained by suit in the Court of Claims. If the Government had made the refunds with the deliberate purpose that, having thus barred the taxpayer's recourse to the Court of Claims, it would initiate an action to recover the refunds as erroneously made, we cannot imagine that any court would find equity in its suit. Yet, although we do not suggest there was such an intention here, the effect of sustaining the action would be the same. The Government had no more reason for thinking the payments "erroneous" when it brought this suit in November, 1963, than when the highest legal officer of the Internal Revenue Service directed them to be made two years before; every fact known to it then was known earlier, save for the Mississippi River decision which cuts against it. Unlike the mine run of cases allowing recovery of refunds, in this instance the Government's payment was not made in the mistaken belief that the merits of the claim required it; on the contrary, the Service indicated that the issue decided against it by a court of high authority would be relitigated in the future. Here, we have no clerical misunderstanding, Woolner Distilling Co. v. United States, 62 F.2d 228 (7 Cir. 1932); Rushlight Automatic Sprinkler Co. v. United States, 294 F.2d 572 (9 Cir. 1961), nor controlling decisions overruled or undermined, Talcott v. United States, 23 F.2d 897 (9 Cir.), cert. denied, 277 U.S. 604, 48 S.Ct. 601, 72 L.Ed. 1011 (1928); United States v. Green, 28 F. Supp. 549 (E.D.Pa.1939), nor even a simple change of mind by the Service on the substantive law, United States v. Tuthill Spring Co., 55 F.2d 415 (N.D. Ill.1931); United States v. Heilbroner, 22 F.Supp. 368 (S.D.N.Y.), aff'd, 100 F.2d 379 (2 Cir. 1938); United States v. Ellis, 154 F.Supp. 32 (S.D.N.Y.1957), aff'd, 264 F.2d 325 (2 Cir. 1959). The Service's position on the merits when it made the refund is precisely what it propounds today, and it is hardly possible for the Government to call this a mistake, let alone one responsible for the refund. We limit our decision to the unusual facts here presented, where the Government deliberately made what it then considered an erroneous refund to a taxpayer prevailing in a court deci-

---

3. Wesley Heat Treating Co. v. C. I. R., 267 F.2d 853 (7 Cir. 1959), does not fill this role; in the confusion caused by the taxpayer's insistence that § 23(a) of the 1939 Code was the controlling section, the court never considered whether § 23 (p) might allow a deduction in the year the employees received payment.

4. The Government contends that a grant of certiorari would be impossible unless it can create a conflict of decisions, and that this can be done only by a procedure such as it here seeks to employ, since sophisticated taxpayers having similar problems will bring refund suits in the Court of Claims rather than resort to the Tax Court or sue for refunds in the district courts. However, the Supreme Court has shown itself entirely able to deal with this kind of tactic, as witness the grant of certiorari on rehearing in Paramount Publix Corp. v. American Tri-Ergon Corp., 293 U.S. 528, 55 S.Ct. 139, 79 L.Ed. 638 (1934). See Robertson & Kirkham, Jurisdiction of the Supreme Court of the United States § 354, at 704 & n. 16 (2d ed. Wolfson & Kurland 1951).

sion whose authority remains unimpaired.

The Government argues in the alternative that however the case might otherwise stand, the refunds here resulted from a mistake by the Chief Counsel of the Internal Revenue Service as to the effect of the Russell judgment as collateral estoppel. After saying that the Service considered the decision incorrect and would not follow it as to other taxpayers, the Chief Counsel's letter continued with a paragraph quoted in the margin,[5] and concluded with the instruction to the District Director already mentioned. The Chief Counsel, it is contended, was wrong in what he wrote about C. I. R. v. Sunnen, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948), since the only trusts at issue before the Court of Claims in the litigation concerning 1945 were, on the view most favorable to the taxpayer, located in the part of the alphabet ending with G, whereas the refund claims range all the way down to P, and the Supreme Court said that "[f]or income tax purposes, what is decided as to one contract is not conclusive as to any other contract which is not then in issue, however similar or identical it may be." 333 U.S. at 602, 68 S.Ct. at 721.

We are not convinced that the paragraph in the Sunnen opinion in which the quoted sentence appears would have so limiting an effect as the Government claims. Collateral estoppel on questions of law exists when the two causes of action "arose out of the same subject matter or transaction" and injustice would not result from barring relitigation. Restatement, Judgments § 70 (1942). The former issue is not to be resolved on a simplistic basis; it would put form over substance to say that a decision like that here would be an effective estoppel for all years and employees if Russell had entered into a single master agreement with the trust company, supplemented by the annual filing of appropriate schedules and terminable at will as to future years, but not if it executed identical trust agreements over a series of years.[6] The great merit of the Sunnen decision was its clarification that a "sufficient change in the legal climate," 333 U.S. at 606, 68 S. Ct. at 723, would make it unjust to apply collateral estoppel on legal issues in income tax litigation. Here, as previously shown, there has been no "intervening legal development," 333 U.S. at 603, 68 S.Ct. at 722, favoring the Commissioner. The law of collateral estoppel is "growing law," Singer v. A. Hollander & Son,

5. "However, with respect to the instant taxpayer the doctrine of collateral estoppel would be applicable. Under this doctrine the judgment of the Court of Claims in the Russell decision would be binding in later years as to matters actually litigated or determined. See Commissioner of Internal Revenue v. Sunnen (1948) 333 U.S. 591 [68 S.Ct. 715, 92 L.Ed. 898]. From your memorandum it would appear that taxpayer's claims raise the precise issue decided adverse to the Government in the case involving fiscal 1945. If this is true, then further litigation would serve no useful purpose since the Court of necessity would abide by its earlier decision, absent a change in the law or facts. The pertinent provisions of the 1939 and 1954 Codes are comparable and this conformity is reflected in the regulations issued in respect to section 23(p) (1) (D) of the 1939 Code, and section 404(a) (5) of the 1954 Code."

6. The cited paragraph was unnecessary in the sense that the Court would have denied collateral estoppel in any event for the reason developed in the very next paragraph as to the contract that admittedly had been at issue in the prior litigation. 333 U.S. at 602–603, 68 S.Ct. at 721–722. Of the cases cited earlier in Sunnen for the proposition now relied on by the Government, 333 U.S. at 601 n. 7, 68 S.Ct. at 721, two do not support so broad a statement and the third only doubtfully.

Inc., 202 F.2d 55, 57 (3 Cir. 1953), see, e. g., Bernhard v. Bank of America Nat. Trust & Sav. Ass'n, 19 Cal.2d 807, 122 P.2d 892 (1942); Bruszewski v. United States, 181 F.2d 419 (3 Cir.), cert. denied, 340 U.S. 865, 71 S.Ct. 87, 95 L.Ed. 632 (1950); United States v. Kramer, 289 F.2d 909 (2 Cir. 1961); Zdanok v. Glidden Co., 327 F.2d 944 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L. Ed.2d 298 (1964), and while restrictions on its application to legal questions in tax cases are undoubtedly required,[7] these ought not be imposed on a mechanical basis.

We are not required, however, to determine whether the Chief Counsel in fact misread the familiar Sunnen opinion or whether, if he did, that kind of "mistake" would warrant an action for restitution. For we are convinced that any such misconstruction had no causal effect on the refunds. It is possible to read the letter as referring to Sunnen only in regard to the trusts that were before the Court of Claims in Russell I and then proceeding to make what we now know to have been the wholly accurate prediction that as to other trusts the Court of Claims would follow its decision on the basis of *stare decisis*. Moreover, if the alleged error as to Sunnen had been called to the Chief Counsel's attention, he would have had to give precisely the same advice to the District Director that he did. Russell's attorney was threatening both the National Office and the District Director with suit in the Court of Claims unless refunds were administratively allowed. Although the Government was prepared to resist the Russell decision as to other taxpayers, it would have made no sense

to restage the match with the same adversary in the same forum with regard to substantially identical instruments; Russell's original margin of victory,[8] the brief interval, and the lack of contrary decisions elsewhere would have made a second defeat for the Service in that court almost inevitable, and grant of certiorari in the case of the same taxpayer would be no more likely after the second defeat than the first. Contrast note 4, supra. The Service thus had every reason to spare itself a losing battle, while biding its time in the hope that the desire not to have to pay a deficiency might lead some other taxpayer to bring the question before the Tax Court or that a "change in the legal climate" would improve its chances in the Court of Claims. If the Chief Counsel made a mistake as to Sunnen, it was thus inconsequential, Restatement, Restitution § 9, comment a (1937).

Affirmed.

LUMBARD, Chief Judge (concurring):

While I agree with the reasons given by Judge Friendly for affirming the judgment of the district court, I wish to place my concurrence on another ground as well, namely, the interpretation of § 23 (p) (1) (D) adopted by the Court of Claims in Russell Mfg. Co. v. United States, 175 F.Supp. 159 (1959). As observed by Judge Davis in Mississippi River Fuel Corp. v. United States, 314 F.2d 953, 958, 161 Ct.Cl. 237 (1963) (concurring), this issue is close, but I find the reasoning of the Court of Claims more persuasive than the contrary arguments advanced by the government.

7. See, Note, Collateral Estoppel as to Questions of Law in Federal Tax Cases, 35 Iowa L.Rev. 700 (1950); Developments in the Law—Res Judicata, 65 Harv. L.Rev. 818, 844–45 (1952); Polasky, Collateral Estoppel—Effects of Prior Litigation, 39 Iowa L.Rev. 217, 235, 240 (1954); Groner & Sternstein, Res Judicata in

Federal Administrative Law, id. at 300, 306–11; Branscomb, Collateral Estoppel in Tax Cases: Static and Separable Facts, 37 Texas L.Rev. 584 (1959).

8. Judge Whitaker's subsequent concurrence in Mississippi River makes it rather evident that his lone dissent in Russell related to another issue in that case.