**EXHIBITORS POSTER EXCHANGE, INC., Plaintiff-Appellant,**

v.

**NATIONAL SCREEN SERVICE CORPORATION et al., Defendants-Appellees.**

No. 74–1459.

United States Court of Appeals, Fifth Circuit.

Aug. 8, 1975.

Rehearing and Rehearing En Banc Denied Sept. 24, 1975.

---

Glenn B. Hester, Augusta, Ga., Francis T. Anderson, C. Ellis Henican, Jr., New Orleans, La., for plaintiff-appellant.

Phillip A. Wittmann, William D. Treeby, Anthony M. DiLeo, New Orleans, La., for Columbia Pictures et al.

James G. Burke, Jr., New Orleans, La., Walter S. Beck, New York City, for Nat. Screen Service.

Before TUTTLE, WISDOM and GOLDBERG, Circuit Judges.

GOLDBERG, Circuit Judge:

This antitrust case—together with its judicial cousins decided today, Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1975, 517 F.2d 117 and Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1975, 517 F.2d 129 —has proceeded toward its culmination with something less than the speed of light. These three cases grow out of the consolidation of the motion picture accessory business, under the dominance of National Screen Service Corp. (National Screen), a development which has generated more than a score of judicial opinions in the Third and Fifth Circuits and the Supreme Court, and covered a span of more than thirty years.

The case at hand concerns the movie poster industry in New Orleans. Plaintiff Exhibitors Poster Exchange, Inc. (Exhibitors) charges in this suit that defendant National Screen and seven mov-

ie production firms (Producers)[1] have combined to restrain free trade in movie posters in Exhibitors' market and to sustain a monopoly in the distribution of these posters for National Screen during the 1967–1971 period. We conclude that Exhibitors is collaterally estopped from proving its allegations by the effect of unappealed judgments against it in previous litigation against these defendants. In discussing the nature of the claim here alleged, we necessarily proceed to sketch the basic structure and history of the poster industry as it relates to all three cases resolved today.

### I

Nearly all motion picture operators employ posters, or accessories, depicting copyrighted scenes from the films to advertise and promote their current and anticipated features, and such posters have been in use since early in the history of the motion picture industry. These posters were originally sold by the motion picture producers to theater operators; but in the Thirties, localized jobbers went into the business of acquiring an inventory of these posters and then renting them out for use and re-use by theater operators in the vicinity. The poster renting business flourished, and by 1940, independent poster renters were established throughout the United States. Plaintiff Exhibitors joined the industry in 1939 in New Orleans.

Early in the 1940's, three of the motion picture producers, Paramount, R.K.O. and M–G–M, each contracted with defendant National Screen regarding the production and nationwide distribution of their standard posters, thus apparently cutting off independent poster renters from access to new supplies of accessories for films produced by those

companies. In response, a band of thirteen independents instituted an antitrust action in the Eastern District of Pennsylvania[2] against National Screen, Paramount, R.K.O., and M–G–M, which ended in a compromise settlement providing that National Screen would grant each plaintiff a license entitling it to purchase all necessary supplies of those producers' accessories (and the accessories of any other producers who might later contract similarly with National Screen) at specified prices. Subsequently National Screen entered into similar exclusive[3] contracts with the remaining five major film producers, Universal, Columbia, United Artists, Warner, and Fox; and a second suit was instituted in the federal district court in Philadelphia, this time against National Screen and all eight major producers. After winning a Supreme Court judgment that their present cause of action was not barred by res judicata because of its continuation after 1943, and because of the enlargement in scope of acts and defendants, Lawlor v. National Screen Service Corp., 1955, 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122, the independent-plaintiffs were ultimately defeated on the merits. Lawlor v. National Screen Service Corp., 3 Cir. 1959, 270 F.2d 146, cert. denied 1960, 362 U.S. 922, 80 S.Ct. 676, 4 L.Ed.2d 742. Braced by this Third Circuit decision in its favor, National Screen proceeded in February, 1961, to notify Exhibitors and other jobbers throughout the country of its intention to discontinue supplying accessories to Exhibitors and the other jobbers (as it had been supplying them since 1943) as of May 16, 1961.

The day after the cut-off, May 17, 1961, Exhibitors initiated suit (Suit 1) against National Screen and six of the seven producers[4] here charged, alleging

---

1. Columbia Pictures Corp., Metro-Goldwyn-Mayer, Inc. (M-G-M), Paramount Film Distributing Corp., Twentieth Century-Fox Film Corp., United Artists Corporation, Universal Films Exchanges, Inc., Warner Brothers Distributing Corp.

2. Allied Poster Corp. v. National Screen Service Corp., Civil No. 2472 (E.D.Pa.1942).

3. The contracts between Producers and National Screen have since been replaced by (at least nominally) non-exclusive agreements. *Cf.* the Consent Decree entered in United States v. National Screen Service Corp., 1957 CCH Trade Cases ¶ 68,670.

4. Columbia was not a party.

violations of Sherman Act, §§ 1[5] and 2,[6] 15 U.S.C. §§ 1 and 2, through a conspiracy to restrain trade and to give National Screen a monopoly, and through National Screen's alleged monopolization and attempt to monopolize the accessory industry. Exhibitors sought treble damages and injunctive relief.[7] Exhibitors initially garnered a preliminary injunction against all defendants, but the injunction was dissolved following discovery, and summary judgment was entered in favor of the Producers. Plaintiff took no appeal.

National Screen remained as a party defendant in Suit 1. As trial approached, Exhibitors filed a second suit in 1964 (Suit 2) against National Screen and all Producers[8] to recover damages suffered since the entry of summary judgment in Suit 1 in 1961. Trial on the remaining aspects of Suit 1 was postponed, and the two suits were merged. Subsequently, in 1965, the district court entered summary judgment for each of the defendants. Again, Exhibitors took no appeal.

Undeterred, Exhibitors filed Suit 3 in 1967 against National Screen and the seven producers, asking for damages from the time of filing Suit 2. The district court entered summary judgment for each defendant on the basis of res judicata and collateral estoppel, and Exhibitors appealed. Exhibitors Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1970, 421 F.2d 1313, cert. denied, 400 U.S. 991, 91 S.Ct. 454, 27 L.Ed.2d 439. Lending an indulgent

reading to Exhibitors' pleadings in Suit 3[9] we concluded that they could be read to allege new claims based on significant post-1961 actions, and that res judicata did not entitle the defendants to summary judgment on that record. We observed further, however,

[a]lthough No. 3 would be a new cause of action and res judicata inapplicable thereto, Exhibitors might still be barred from further action on certain issues by collateral estoppel. The doctrine is classically stated by Mr. Justice Field in Cromwell v. County of Sac, 1877, 94 U.S. 351, 24 L.Ed. 195 when he says that in 'a second action between the same parties * * * upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' at 94 U.S. 353, 24 L.Ed. 198. It forecloses inquiry only as to those issues which were necessarily determined. United States v. Burch, 5 Cir. 1961, 294 F.2d 1, 5.

Thus it is necessary to determine what were the 'matters in issue or points controverted' in Suits No. 1 and No. 2. This determination is to be made on the basis of the prior records. The process was generally described by Mr. Justice Day: 'To answer these questions, we must look to the pleadings making the issues, and examine the record to determine the questions essential to the decision of the former controversy.' United Shoe Machinery

---

5. Section 1 provides that:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

6. Section 2 provides that:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize any part of the trade or commerce among the several States, or with foreign nations shall be deemed guilty of a misdemeanor . . . .

7. Section 15 of the Act provides that:

Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee.

8. Including Columbia.

9. See Conley v. Gibson, 1957, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80.

Corp. v. United States, 1922, 258 U.S. 451, 459, 42 S.Ct. 363, 366, 66 L.Ed. 708, 718.

421 F.2d at 1319.

We then proceeded to identify the issues determined in Suits 1 and 2, and thereby precluded from re-litigation in Suit 3, as including the lawfulness under §§ 1 and 2 of the Sherman Act of the defendants' 1961 activities. Concluding, however, that Exhibitor's pleadings might be interpreted to encompass new actions beyond those charged in the earlier suits, we remanded the case to allow Exhibitors an opportunity to prove such subsequent substantive antitrust violations.

On remand Exhibitors offered to prove only that the alleged antitrust behavior of which it has complained since 1961—National Screen's consolidation of the industry, refusal to deal with Exhibitors, and exclusive dealing with Producers—has continued throughout the period sued upon.[10] Exhibitors has not alleged any new and different activities or agreements by or between the defendants, or any new and different disruption of plaintiff's business. On the contrary, its position, as stated to the district court, was that the defendants "are not doing anything different from what they've done before. There is nothing different after 1961 . . . ." On this record, the district court denied Exhibitors a preliminary injunction in 1970, which denial we affirmed, Exhibitors Poster Exchange v. National Screen Service Corp., 5 Cir. 1971, 441 F.2d 560, and ultimately again entered summary judgment in favor of the defendants on the basis of res judicata, collateral estoppel, and the statute of limitations. We conclude that summary judgment was properly granted on the basis of collateral estoppel, and do not reach the alternative grounds.

## II

■ The judgment entered by the district courts in Suits 1 and 2 established that the activities of Producers and National Screen did not amount to a § 1 conspiracy and that National Screen had not monopolized or attempted to monopolize the industry in derogation of § 2. In this lawsuit Exhibitors complains of conduct identical to that on which it has once litigated and lost, the continuance of the defendants in conduct already declared lawful. As Exhibitors admits in its brief, it alleges that the antitrust conspiracy and monopoly of which it complains "became complete" on May 16, 1961, and that the defendants' post-1961 conduct has simply continued violations without any alteration in their nature. We think it clear that under the collateral estoppel principles recognized in our previous opinion in this case,[11] the judgments in Suits 1 and 2 bar relitigation of the applicability of the identical antitrust principles[12] to this identical and inseparable conduct.

Collateral estoppel bars a plaintiff from assailing the defendants for proceeding without change upon a course of conduct previously held lawful against plaintiff's identical attack. *Accord* Scooper Dooper, Inc. v. Kraftco Corp., 3 Cir. 1974, 494 F.2d 840, 845–50; Vogelstein v. National Screen Service Corp., E.D.Pa.1962, 204 F.Supp. 591–595, aff'd per curiam, 3 Cir., 310 F.2d 738, cert. denied, 1963, 374 U.S. 840, 83 S.Ct. 1894, 10 L.Ed.2d 1061; United States v. Gen-

---

10. Exhibitors initiated Suit 4 against National Screen and all seven producers in 1971 "to bring down to date the claim for damages made [in Suit 3]." That suit was merged with No. 3 in 1972. RKO Radio Pictures was added as a party defendant in Suit 4, but was never served.

11. Reiterated in Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1972, 456 F.2d 662, 665–66.

12. Plaintiffs point to no intervening changes in applicable law. *See* Commissioner v. Sunnen, 1948, 333 U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898. As our opinion affirming the district court's judgment of illegality of National Screen's Atlanta operations demonstrates, the antitrust principles offended by National Screen's conduct there were hardly novel. *See* Poster Exchange, Inc. v. National Screen Service Corp., 5 Cir. 1970, 431 F.2d 334.

eral Electric Co., S.D.N.Y.1973, 358 F.Supp. 731, 742 n. 11 (dictum); *see* 1B Moore's Federal Practice ¶ 0.448, at pp. 4238–39 (2d ed. 1974); *see also* Engelhardt v. Bell & Howell Co., 8 Cir. 1964, 327 F.2d 30, 35–36; North Counties Hydro-Electric Co. v. United States, 1957, 151 F.Supp. 322, 324, 138 Ct.Cl. 380.[13] Otherwise, collateral estoppel would afford no peace to those, such as the defendants here, who pursue a continuing course of conduct once adjudged lawful. *See* Scooper Dooper, Inc. v. Kraftco Corp., *supra,* 494 F.2d at 846.

█ Evidently recognizing the force of these principles, Exhibitors admits that "if it is assumed that all acts committed by defendants prior to 1961 are legal and lawful, plaintiff has no case and should be out of court." Its sole contention regarding the application of collateral estoppel to defeat its present case is that the judgments rendered against it in Suits 1 and 2 cannot serve as the basis of an estoppel because they were entered upon a summary judgment without specific factual findings, rather than upon a trial of contested facts. But we rejected this contention in no uncertain terms in our 1970 opinion in this case:

We reject out of hand the beguiling but superficial contention of Exhibitors that neither Suit No. 1 nor No. 2 can have any collateral estoppel effect because no summary judgment can have such effect. This is based on an overemphasis of two assertions: (1) a collateral estoppel results only from an actual decision of an issue and (2) a summary judgment results from a finding that there is no genuine issue as to any material fact.

It would be strange indeed if a summary judgment could not have collateral estoppel effect. This would reduce the utility of this modern device to zero. It would compel the useless ritual of a formal trial to get the equivalent ruling at the end of the evidence—plaintiff's, defendant's or all—of a directed verdict. Indeed, a more positive adjudication is hard to imagine. It is determination that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' F.R.Civ.P. 56(c). And it most certainly encompasses ultimate facts of the kind here involved. The only enigma involved is determining

13. Speaking in the analogous context of a tax suit depending upon the resolution of the legal significance of a recurring factual situation, where "[c]ollateral estoppel operates . . . to relieve the government and the taxpayer of 'redundant litigation of the identical question of the statute's application to the taxpayer's status,'" the Supreme Court has recognized that "[a] taxpayer may secure a judicial determination of a particular tax matter, a matter which may recur without substantial variation for some years thereafter. But a subsequent modification of the *significant* facts or a change or development in the controlling legal principles may make that determination obsolete or erroneous, at least for future purposes." Commissioner v. Sunnen, 1948, 333 U.S. 591, 599–600, 68 S.Ct. 715, 720, 92 L.Ed. 898, 906 (emphasis added). Thus, where a change in circumstances has rendered the facts in a tax adjudication materially different from those considered in connection with a prior year, collateral estoppel does not bar the second proceeding. *See, e. g.,* Flato v. Commissioner, 5 Cir. 1957, 245 F.2d 413; Alexander v. Commissioner, 5 Cir. 1955, 224 F.2d 788. But we have made clear that even in such a changed situation, a conclusion that different tax consequences attach to the succeeding year must be premised upon a finding that changed facts truly distinguish the situation from the previous year, and that the subsequent year's different treatment cannot be based upon a mere reappraisal of the prior year's facts. *See* Thomas v. Commissioner, 5 Cir. 1963, 324 F.2d 798. And where no intervening facts or law of consequence has changed, collateral estoppel has been held to preclude relitigation of identical tax matters arising in successive years. *See, e. g.,* Weiszmann v. Commissioner, 10 Cir. 1973, 483 F.2d 817; Jones v. United States, 10 Cir. 1972, 466 F.2d 131; Southern Maryland Agricultural Ass'n v. United States, 1957, 147 F.Supp. 276, 137 Ct.Cl. 176; *see also* United States v. Russell Mfg. Co., 2 Cir. 1965, 349 F.2d 13, 18–19; McCall v. Commissioner, 4 Cir. 1963, 312 F.2d 699, 702–03; Stanback v. Commissioner, 4 Cir. 1959, 271 F.2d 514, 516 n. 6. (In this connection we note that collateral estoppel is sparingly applied in tax matters, *see* United States v. Russell Mfg. Co., 2 Cir. 1965, 349 F.2d 13, 19; Jones v. United States, 10 Cir. 1972, 466 F.2d 131, 133. *Cf.* United States v. Stone & Downer, 1927, 274 U.S. 225, 47 S.Ct. 616, 71 L.Ed. 1013).

which of one or more multiply decisive issues of fact the Court on summary judgment determined was totally lacking in legal significance. If a claim requires elements 1, 2 and 3 for recovery, summary judgment is proper if 2 is missing. But this would not give to a summary judgment based thereon a perpetual cloak to forbid inquiry into 1 or 3, or both. This would distort the wholesome policy behind collateral estoppel.

421 F.2d at 1319. We then proceeded to a close examination of the records in Suits 1 and 2, to determine the precise questions there resolved; these judgments as we have already noted, were found clearly to hold in favor of the lawfulness of the defendant's pre-1961 actions. So much established, plaintiff Exhibitors is estopped from attempting to prove the alleged wrongfulness of the defendants' continuation of identical conduct during the period sued upon here; and the district court was correct in entering summary judgment for the defendants in this case.

In conclusion, we note that the net result of our holding here—finding Exhibitors estopped from proceeding against defendant National Screen—appears in some ways at odds with the adjudication affirmed in the Atlanta image of this litigation, which held National Screen responsible for antitrust abuses against Exhibitors' Atlanta counterpart. See Poster Exchange, Inc. v. National Screen Services Corp., 5 Cir. 1970, 431 F.2d 334. If such an inconsistency exists, we are unable to remedy it in this

proceeding. As we recognized in our 1970 opinion in this case, "whether rightly or wrongly" the district court determined in Suit 2 that National Screen had not monopolized or attempted to monopolize Exhibitors' market, and Exhibitors took no appeal from that decision. There is no suggestion of any intervening change of law since that adjudication in favor of National Screen; [14] nor is there any allegation of factual developments which could distinguish the present case against National Screen from that lost in 1965. See Thomas v. Commissioner, supra, 5 Cir. 1963, 324 F.2d 798. We are bound as fully in this case to adhere to collateral estoppel principles as we would be if no judgment had been rendered in the Atlanta litigation. Indeed, any other result would prejudice the defendants here who may have proceeded in reliance upon the verdict in Exhibitor's prior litigation.

To avoid the bar sinister of collateral estoppel, something significant must have been added. Re-run scenarios with no new projections write "finis" to the litigation. Old posters never seem to die, nor even fade away. Some cases must have a merciful death, and collateral estoppel provides the necessary lethality where the vital organs of litigation have exhausted themselves already. Here we see no new scenes, no new entrances or exits, simply a continuation of the same drama, which has been held unviolative of the antitrust laws.

The judgment appealed from is affirmed.

14. See note 12, supra. Moreover, at the time the district court in New Orleans gave National Screen a summary judgment in Suit 2 (in 1965) we had already made clear that the Third Circuit's determinations as to National Screen's alleged antitrust behavior were not conclusive in the Atlanta litigation paralleling this suit. See National Screen Service Corp. v. Poster Exchange, Inc., 5 Cir. 1962, 305 F.2d 647. In that case we affirmed the Atlanta district court's grant of a preliminary injunction against National Screen and its refusal to grant National Screen a summary judgment.