**UNITED STATES of America, Plaintiff,**

v.

**Geraldine BELL, Defendant.**

**Civ. A. No. 91–11670–WD.**

United States District Court,
D. Massachusetts.

April 7, 1993.

---

Charles J. Cannon, U.S. Dept. of Justice, Tax Div., Washington, DC, for plaintiff.

Geraldine L. Bell, Revere, MA, pro se.

## MEMORANDUM AND ORDERS

WOODLOCK, District Judge.

A working mother, under threat of physical harm by her estranged husband, made a $10,000 estimated tax payment to the Internal Revenue Service ("IRS") to cover the couple's prospective tax liability. She withdrew the money from custodian accounts she held on behalf of their children, made the payment, and immediately obtained a restraining order protecting her from her husband. As the torn fabric of the marital relationship unravelled, she filed a separate return for the tax year and claimed the entire $10,000 payment for herself, upon the advice of an IRS employee assigned to provide taxpayer assistance. Because her own modest income did not produce a substantial tax liability, she received a refund from the IRS.

The IRS thereafter decided the refund was improper and has since pursued various methods to recoup the money from her. In this action, the IRS attempts, under 26

U.S.C. § 7405, to recover the sum of money allegedly refunded in error to *pro se* defendant Geraldine Bell. Both parties seek judgment as a matter of law; and for purposes of its motion, the government does not contest the defendant's version of the facts. Finding no equitable basis upon which I can countenance the government's undertaking here,[1] I will deny the government's motion and declare that as of April 15, 1993, Mrs. Bell has been caused to have made an overpayment of $1,798.07 to the IRS.

## I.  Background

Prior to 1988, Geraldine Bell lived with her then-husband William Bell in the town of Revere, Massachusetts. The Bells both worked for the town; the defendant was a custodian and her husband was a municipal tax collector. Throughout their marriage, the couple had customarily filed joint tax returns. By 1988, however, their relationship had deteriorated and they were soon to be divorced.

At some time on or about November 3, 1988, Geraldine Bell received a telephone call from her estranged husband. He informed her that they were required to make a $10,000 estimated tax payment to the IRS and threatened to kill her if she failed to do so. Subsequently, the defendant withdrew $5,000 from each of two bank accounts that she held as guardian for her two children and purchased a cashier's check for $10,000, payable to the Internal Revenue Service. Neither defendant's nor her husband's name nor their social security numbers was noted on the face of the check. The defendant mailed this check to the IRS, together with an estimated tax payment voucher bearing the name and social security number of both herself and her husband.

On November 10, 1988, the defendant obtained from the Chelsea District Court an order under Mass.Gen.L. ch. 209A mandating that her husband William Bell vacate the marital home.[2] (IRS Brief, Gov't Exh. 13.) Geraldine and William Bell were divorced approximately one year later, on December 12, 1989. (Judgt. of Divorce, attached to Letter from Defendant.)

In April of 1989, the defendant met with an IRS employee at the JFK Federal Building in Boston to receive assistance in preparing her tax return for 1988. The IRS employee advised the defendant that she could claim tax credits for the full amount of the November 1988 estimated tax payment ($10,000) plus the full amount of credits carried over from tax year 1987 ($3,015). The defendant filed her tax return on April 28, 1989 and indicated therein that her filing status was "married filing separate." She reported total income of $19,692 and claimed withholding tax payments of $2,420, plus additional tax credits, including estimated tax payments, of *$13,015*. The defendant subsequently received from the IRS a refund check dated June 26, 1989 in the amount of $13,927.72.

William Bell filed his tax return for 1988 on October 16, 1989. He reported adjusted gross income of $62,284, including a capital gain (from the sale of real estate) of $46,081. Against that income, he claimed withholding tax credits of $2,674, plus a credit for esti-

---

1. In rebuffing the government's refund recovery effort in this case, I intend no disparagement of government counsel. To the contrary, government counsel pursued a less than sympathetic case in a fashion that nevertheless reflects well upon him, his office, and his profession. He dealt in a fair, evenhanded and helpful manner with a vulnerable and unsophisticated *pro se* adversary, without compromising his own client's litigation position. In that sense, although I do not accept the government's position as a matter of equity, I nevertheless am of the view that the larger aims of the government's legal posture have prevailed. As Justice Jackson, while Attorney General, noted, the "government does not lose any case, if, by its result, justice is done." Jackson, *Government Counsel and Their*

*Opportunity*, 26 A.B.A.J. 411, 412 (1940). *See also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963) (noting "inscription on walls of the Department of Justice [which] states the proposition candidly for the federal domain: 'The United States wins its point whenever justice is done its citizens in the courts.' ").

2. Under Chapter 209A, a "person suffering from abuse from an ... household member" may file a complaint against that household member, and a court may thereupon, inter alia, "order[ ] the defendant to vacate forthwith and remain away from the household...." Mass.Gen.L. ch. 209A, § 3 (Supp.1993).

mated tax payments and credits carried over from 1987 in the amount of *$13,015.*

The IRS soon realized that the defendant and her ex-husband had both separately claimed as tax credits the entire amount of the $10,000 estimated tax payment of 1988 and the $3,015 tax credit left over from 1987. In consequence, just prior to Christmas of 1989, the defendant received the first in a series of letters [3] from the IRS notifying her that most of the $13,927.72 she had received the previous summer had been refunded to her in error. The first letter indicated that the IRS had erroneously credited to the defendant a "payment belonging to another taxpayer" and requested that she remit to the IRS a check for $10,139.58. The second letter, dated February 9, 1990, instructed the defendant to send a check for a "revised" total of $12,804.33. The third letter, dated February 12, 1990, indicated that the "correct balance due IRS" was $1,716.38.[4] The final letter, dated April 10, 1990, advised the defendant that the "actual amount due the Service" by her was $10,424.07.

The defendant did not remit any amount to the IRS. As a result, the IRS placed a tax lien upon her house for $1,699, the amount of defendant's assessed tax liability for 1988. On November 21, 1990, the defendant's father paid to the IRS the sum of $2,100.85 ($1,699 plus accrued interest) in order to discharge the lien.

Meanwhile, the defendant had obtained a divorce from William Bell. Although he had an obligation of support to the defendant and her children, William Bell had fallen far behind on his payments. By October of 1990, the arrearage had grown to a total of $9,041. *See* Order for Support, Health Insurance & Income Assignment, No. 88D1897 (Suffolk County Prob. & Fam.Ct., Oct. 4, 1990) [attached to Letter from Defendant]. To recover the amounts in arrearage, the defendant in October of 1990 applied for and received from the Probate and Family Court an order that a certain portion of William Bell's income be assigned to the defendant and to the Massachusetts Department of Revenue.

The IRS asserts that the bulk of the $13,927.72 check issued to the defendant in June of 1989 constitutes an erroneous refund. The purported error stems from the $13,012 in tax credits—the $10,000 estimated tax payment made by the defendant in November of 1988 and the $3,012 credit carried over from 1987—which were claimed by both the defendant and her former husband on their 1988 returns. The IRS argues that it mistakenly credited the defendant with the whole amount of the $13,012, instead of allocating a share of the amount separately to the defendant and her former husband respectively. The government asserts that the balance due the IRS from the defendant was $10,724.59, as of October 31, 1992.

## II. The $10,000 Estimated Tax Payment

At the heart of this case is the $10,000 estimated tax payment made by the defendant (ostensibly on behalf of herself and her husband) in November of 1988.[5] Both the defendant and William Bell claimed the *entire* amount of the $10,000 payment as a credit on their separately filed tax returns for 1988. The IRS, relying on Treasury Regulation 1.6015(b)–1, argues that the defendant was not entitled to a credit for the entire $10,000 payment, and that her allocable share of the $10,000 payment should have been calculated to match the proportion of her 1988 tax liability to the combined amount of her 1988 tax liability and that of William Bell.

Treasury Regulation 1.6015(b)–1(b) provides that if a husband and wife make joint payments of estimated tax but do not subsequently file a joint return, and if the husband and wife fail to agree to a division of the payment, then

[t]he portion of such [estimated tax] payments to be allocated to a spouse shall be that portion of the aggregate of all such payments as the amount of [total tax liabil-

---

3. IRS Brief, Gov't Exhs. 9–12.

4. Apparently, this amount reflected the revised amount of defendant's tax liability for 1988.

5. The defendant has no arguable basis for retaining any more than her proportional share ($386.93) of the $3,015 tax credit carried over from 1987.

ity] ... shown on the separate return of the taxpayer ... bears to the sum of the [total tax liability] ... shown on the separate returns of the taxpayer and his spouse....

26 C.F.R. 1.6015(b)–1(b).[6] According to this formula, the defendant's share of the $10,000 credit is limited to the amount of $1,283.33.[7]

■ The government observes in its Supplemental Brief, and correctly so, that the Treasury Regulations promulgated under the Internal Revenue Code are legislative in character, not merely interpretive, and thus have the force of law. *See, e.g., CWT Farms, Inc. v. Commissioner of Internal Revenue,* 755 F.2d 790, 800 (11th Cir.1985). It cannot be gainsaid, then, that Treasury Regulation 1.6015(b)–1(b) governs the technically correct division of an estimated tax payment that is jointly made but separately claimed by two married taxpayers who dispute their relative entitlements. Thus, if a taxpayer were to sue the government in order to challenge the IRS's allocation of a particular estimated tax payment, the Treasury Regulations would presumably provide a dispositive basis for resolution of the case.[8]

■ As the IRS acknowledges, however, (IRS Brief at 15), a suit to recover an erroneous refund is essentially an action for restitution and thus must be governed by principles of equity. *United States v. Reagan,* 651 F.Supp. 387, 389 (D.Mass.1987). As Judge Friendly wrote:

An action [by the government] to recover a tax refund is an action for restitution, and the plaintiff in such an action can prevail only by showing an affirmative ground that will move the conscience of the court.... [T]he Government must show that the taxpayer "has money which, *ex aequo et bono,* it ought not to retain."

*United States v. Russell Mfg. Co.,* 349 F.2d 13, 16 (2d Cir.1965) (quoting *Houston Prod. Co. v. United States,* 4 F.Supp. 715, 718 (S.D.Tex.1933)).

■ Thus when, as here, a court is called upon by the IRS to order a taxpayer to make restitution to the government, the inquiry must not be restricted to a mechanical and context-insensitive application of a Treasury Regulation, even a facially relevant one. "Equity eschews mechanical rules; it depends on flexibility." *Holmberg v. Armbrecht,* 327 U.S. 392, 396, 66 S.Ct. 582, 584, 90 L.Ed. 743 (1946). The issue in this case therefore cannot be conceived as simply whether an error was made by the IRS in crediting the defendant with the full amount of the $10,000 estimated tax payment at issue. That an "error" was indeed made by the IRS is not truly a matter of contention here. That is, it seems clear that the IRS did not follow its own regulations in crediting the defendant with the whole amount of the estimated tax payment. But whether the government is in equity entitled to *restitution* presents a different question, one which

---

6. Regulation 1.6015(b)–1 was originally promulgated under I.R.C. § 6015(b). Section 6015(b) of the Code, however, was repealed in 1984. The IRS nevertheless argues that the regulation still governs the proper division of estimated tax payments filed jointly but claimed separately. Without deciding the question, I assume for purposes of this motion that insofar as Regulation 1.6015 represents a facially rational method for dealing with the problem of jointly made but separately claimed estimated tax payments, the IRS is entitled to employ that regulation to determine the proper method of allocating credits against such payments.

7. This is the fraction of the $10,000 estimated tax payment that corresponds to the ratio of the defendant's assessed tax liability for 1988 ($1,699) to William Bell's IRS-corrected tax liability for the same year ($11,540). The figure of $11,540 represents what William Bell's tax liabil-

ity for 1988 would have been had he, like the defendant, indicated his filing status to be "married filing separate." On his actual return, William Bell indicated his status to be "single."

8. I note however, that Regulation 1.6015(b)–1(b) does not literally apply to the situation in which married parties file a joint estimated tax payment, thereafter become divorced, and subsequently file separate returns. The IRS cites a General Counsel Memorandum that indicates that the Service would *interpret* the Regulation to apply to such cases, *see* Gen.Couns.Mem. 36,485 (Nov. 12, 1975), but a General Counsel Memorandum is clearly not "legislative" in the same sense as is a Treasury Regulation. In this case, the defendant was still married to but separated from William Bell as of the time she filed her 1988 tax return. She became divorced, however, prior to receiving the erroneously issued refund.

must be mediated by basic considerations of justice and substantive fairness.

■ The ultimate inquiry must focus upon whether, given the singularly peculiar circumstances of this case, the court may in good conscience require the defendant to make restitution to the government for the amount of the refund at issue, even *assuming* that such refund was erroneous under Treasury Regulation 1.6015(b)–1(b).[9]

■ At the root of the notion of restitution in equity is the principle that no person should be allowed unjustly to retain a benefit conferred by another at the other's expense; in short, that no person should be unjustly enriched. *See* Restatement of Restitution § 1 (1937). In the ordinary case, the recipient of an erroneously issued tax refund would be unjustly enriched if allowed to retain the refund. Thus, the government will almost invariably be entitled to recover the full amount of any refund that it demonstrates to have been erroneously issued. It would be an unacceptable hindrance to the normal functioning of the Internal Revenue Service for the government to be foreclosed with any degree of regularity from recovering refunds erroneously issued to taxpayers. Consequently, certain kinds of equitable arguments will almost always fail as defenses against the IRS. For example, the mere fact that a taxpayer materially and detrimentally relied upon entitlement to an erroneous refund will not preclude recovery by the government. *See, e.g., United States v. Reagan,* 651 F.Supp. at 389. Moreover, a defendant can almost never successfully argue that the government should be estopped by the conduct of its agents from recovering an erroneous refund.[10]

9. The government cites *Magniac v. Thomson*, 56 U.S. (15 How.) 281, 14 L.Ed. 696 (1853), and *Knight v. Town of Glocester*, 831 F.2d 30 (1st Cir.1987), as authority for the doctrine *"equitas sequitur legem."* (IRS Suppl. Brief at 4.). The government appears to suggest that it follows from this maxim that Treasury Regulation 1.6015(b)–1(b) must dictate the outcome in this case. The principle that equity follows the law, however, is generally invoked by courts in cases where a plaintiff seeks a remedy on equitable grounds where none is provided by positive law. The doctrine cannot properly be understood to mean that a court cannot take into account considerations of justice and fairness in determining whether a defendant should be required to pay restitution to the plaintiff.

In *Magniac*, for example, the defendant had been in custody on a writ of *capias ad satisfaciendum*. The parties agreed to the defendant's discharge from custody on the condition that the defendant would submit to a trial on the issue whether he had the means to satisfy the debt owing to the plaintiff. The trial resulted in a verdict for the defendant. *See Magniac*, 56 U.S. at 295–99. When, however, the defendant acquired new assets as a result of the death of his wife, the plaintiff sought to revive the old debt against the defendant. In its opinion, the Court first explained the established rule that a voluntary release from custody on a writ of *capias ad satisfaciendum* constitutes satisfaction and release from the debt upon which the writ was executed. *See id.* at 300–01. In light of this rule, and absent any evidence to support the plaintiff's argument of fraudulent activity by the defendant, the Court stated that "equity must follow, or in other words, be subordinate to the law" and held that it lacked equitable jurisdic-

tion to grant relief to the plaintiff. *See id.* at 302–03.

In *Knight v. Town of Glocester*, the plaintiff had sued the Glocester, Rhode Island police department for wrongful termination in violation of his constitutional right to due process. The trial court found that the defendant had not violated the plaintiff's constitutional rights but nonetheless ordered the town to " 'take all reasonable steps to enroll' " the plaintiff in the police academy, on the basis that " 'fairness and equity require that the town do something to seek to remedy the situation.' " *Knight*, 831 F.2d at 31, 32 (quoting trial court opinion). The First Circuit, observing that "equity must follow the law," reversed the district court's ruling. *Id.* at 32. The court quoted from a Supreme Court opinion that stated, " '[equity's] decrees can only enforce remedies to the extent and in the mode by law established.' " *Id.* (quoting *Rees v. City of Watertown*, 86 U.S. (19 Wall.) 107, 121, 22 L.Ed. 72 (1873)).

*Magniac* and *Knight* provide support for the proposition that equity cannot provide a plaintiff with a remedy where such a remedy is clearly precluded by law. Here, however, the plaintiff is the United States government, and it is the government that is suing—in equity—for restitution of an amount erroneously issued to the defendant. The principle that equity follows law cannot be invoked to preclude consideration of the factual oddities of this case in deciding whether or not to grant equitable relief (restitution) to the government.

10. It is well settled that " 'the traditional doctrine of equitable estoppel does not apply fully ... against the government,' " *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 761 (1st Cir.1985) (quoting *Akbarin v. INS*, 669 F.2d 839, 842 (1st

This case, however, does not turn on the typical appeal to estoppel or to an argument based on detrimental reliance by the taxpayer. Rather, this case features special considerations that weigh heavily in the equitable balance and that substantially qualify the character of the defendant's "enrichment" by the IRS.

Although the parties in this action are nominally the defendant Geraldine Bell and the IRS, the ultimate beneficiary of the IRS's efforts is in fact William Bell, the defendant's ex-husband. In principle, William Bell becomes entitled to keep or receive[11] every dollar of the $10,000 estimated tax payment for which Geraldine Bell is disallowed from claiming a credit. Thus, any recovery by the IRS against the defendant relating to the $10,000 estimated tax payment would redound to the benefit of William Bell.

Against the background of this "special" consideration, the factual circumstances of this case tip the scales of equity decidedly to the side of the defendant. Any suggestion that the defendant, herself, has somehow been unjustly enriched is unsupportable. First, the $10,000 estimated tax payment of 1988 was made by the defendant at the demand of and under coercive threats of violence by William Bell. Although the $10,000 payment is purported to have been made on behalf of both the defendant and William Bell, that payment had its source solely in bank accounts held by the defendant in a fiduciary capacity, as guardian for her children. Thus, assuming to be true the defendant's allegation that she made the estimated tax payment under threat of serious harm by William Bell,[12] the transaction takes on the cast of extortion.[13] It becomes difficult, then, to conceive of any palatable consideration of policy that would point in favor of allowing William Bell to claim the lion's share of the tax benefits attributable to the putatively-joint $10,000 payment, which was drawn from the funds of his children to whom he has failed to provide support.

Second, the defendant and William Bell were separated and soon to be divorced in the interim between the joint estimated tax payment and the filing of their tax returns. Had the defendant known or foreseen in 1988 that she and William Bell were to file separate tax returns for 1988, she would have had no rational motivation—absent the threat of violence—to make the estimated tax payment, because she would have had no prospective source of income that would have necessitated it. It was the capital gain from the sale of real estate owned (separately) by William Bell that gave rise to the need to make the payment. (*See* IRS Brief, Gov't Exh. 14.) This is not, of course, to suggest that the fact of the defendant's divorce necessarily justifies allocation to the defendant a greater share of the estimated tax payment than that to which she would otherwise be entitled.[14] Rather, the point is that the divorce counts as a circumstance which, together with the fact that the payment came solely from funds in the defendant's custody, should receive some consideration in the determina-

Cir.1982)), and this principle holds no less true in cases involving the government's power of taxation. Absent some showing of "affirmative misconduct," *see id.*, no estoppel can be raised against the government based on alleged misrepresentations or erroneous advice offered by IRS agents. There is no suggestion in this action that the government engaged in any affirmative misconduct.

11. It is not clear from the record whether the IRS ever issued a 1988 refund check to William Bell.

12. *See* Dep. of G. Bell at 16, attached to IRS Brief. The defendant's allegation is buttressed by the fact that the defendant did obtain in 1988 a Chapter 209A order in state court requiring her then-husband to vacate the marital home. *See supra.*

13. As between the defendant and William Bell, the defendant might very well be entitled to restitution from Bell. *Cf.* Restatement of Restitution § 70 ("A person who has conferred a benefit upon another as the result of a transaction which is void or voidable because of duress or undue influence, is entitled to restitution . . .").

14. As mentioned above, the IRS has indicated that it would interpret Regulation 1.6015(b)–1(b) to apply to cases in which the taxpayers were married at the time the joint estimated tax payment was made but divorced at the time credit for the payment was (separately) claimed. *See* Gen.Couns.Mem. 36,485 (Nov. 12, 1975).

tion whether the IRS is entitled to restitution from the defendant.[15]

Finally, William Bell has fallen into arrears with respect to support payments due the defendant and her children. The Internal Revenue Code explicitly allows and directs the IRS in certain circumstances to intercept any tax refund belonging to taxpayers who hold past-due support obligations. *See* I.R.C. § 6402(c).[16] The defendant claims that in August of 1988, she contacted the IRS and "filled out the proper paper work so that they could intercept any refund payment made to [William] Bell," but that the IRS "failed to follow ... through." (Letter from Defendant.) Although it has not been suggested—and I see no formal mechanism for directing—that § 6402(c) should actually be applied to William Bell's tax refund in this case, the fact that Bell bears past-due support obligations to the defendant and her children is another factor to be weighed in the determination whether the IRS is entitled to restitution from Mrs. Bell.

I find that the foregoing circumstances militate against allowing the IRS to prevail against the defendant in this action. It is the confluence of the various factual peculiarities of this case, against the background of recognition that the IRS's recovery here would in fact inure to the ultimate benefit of William Bell, that leads me to this conclusion. I stress that my ruling is limited to the particular facts of this action.

I reiterate in summary form the unique circumstances surrounding the disputed refund issued to the defendant: the defendant made a joint payment of estimated tax on behalf of herself and her former spouse under threat of physical harm by the former spouse; the payment came solely from funds held by the defendant for her children; the income necessitating the payment was attributable solely to the defendant's former spouse; the defendant became permanently separated (soon to be divorced) in the interim between the making of the payment and the filing of her separate return; the defendant's former spouse fell into arrears with respect to support payments to the defendant and her children; and the defendant claimed credit for the full amount of the estimated tax payment upon advice of an IRS representative. Given this set of facts, the balance of equities tilts firmly in favor of the defendant, and I cannot find that the $10,000 estimated tax payment in this case constitutes "'money which, *ex aequo et bono*, [the taxpayer] ought not retain.'" *Russell Mfg. Co.*, 349 F.2d at 16. I conclude, accordingly, that the government is not entitled to restitution from the defendant with respect to any portion of the disputed refund attributable to the $10,000 tax credit that the defendant claimed on her 1988 return. The government is entitled to recover, however, that portion of the disputed refund stemming from the $3,015 tax credit carried over from 1987 that exceeds the defendant's proportional share thereof (*viz.*, $386.93). *See* note 5 *supra*.

### III. Equitable Resolution

■ Having concluded that the IRS is not entitled to recover from the defendant any of the disputed $10,000 credit for tax year 1988, I exclude that amount from the defendant's outstanding liability to the IRS. Moreover, I decline to ratify any collateral efforts by the government to recover that amount. To allow such efforts would be to permit an indirect restitutionary remedy, when I have found a direct remedy inequitable. Thus, in order to ensure that the government does

---

**15.** As between the defendant and William Bell, the former might well be entitled to restitution from the latter on the ground that the payment for the benefit of William Bell was impliedly conditioned on the parties' remaining married and jointly benefiting from each spouse's separate income. *Cf.* Restatement of Restitution § 58 & com. b (stating that a person who confers a benefit upon another may be entitled to restitution from the other if the conferring of the benefit is conditioned on the continuation of a relationship).

**16.** The provision reads in part:

The amount of any overpayment to be refunded to [a] person making the overpayment shall be reduced by the amount of any past-due support ... owed by that person of which the Secretary has been notified by a State.... The Secretary shall remit the amount by which the overpayment is so reduced to the State collecting such support and notify the person making the overpayment that so much of the overpayment as was necessary to satisfy his obligation for past-due support has been paid to the State....
I.R.C. § 6402(c).

not through nonlitigatory means (such as a tax lien) achieve partial restitution, I here provide a recalculation of Mrs. Bell's outstanding tax balance. The defendant is entitled to credits against her current liability in the following amounts, which as a matter of arithmetic are not disputed by the IRS: (1) the November 21, 1990 payment to the IRS of $2,100.85, which her father paid to realize a lien on her home; (2) the amount of $386.93, which represents defendant's allocable share of the tax credit carried over from 1987, *see* note 5 *supra;* and (3) the amount of $2,204, which represents the defendant's overpayment of taxes for tax year 1989. According to the IRS's computations based on these figures, the government is entitled to no recovery from the defendant; rather, as a result of the various credits against the defendant's liability, the defendant has been caused to overpay the plaintiff the amount of $1,798.07 as of April 15, 1993.

## IV. Conclusion

For all of the reasons set forth more fully above, I hereby order judgment for the defendant in the form of a declaration that the United States is not entitled to recover any portion of the refund stemming from defendant's $10,000 estimated tax payment of November 1988, and that as of April 15, 1993, defendant has overpaid the government in the amount of $1,798.07.