**UNITED STATES of America**

v.

**Harold D. FARLEY; Gail D. Farley, Appellants.**

**No. 99–3209.**

United States Court of Appeals, Third Circuit.

Argued Oct. 28, 1999.

Filed Jan. 27, 2000.

Harry Litman, United States Attorney, Loretta C. Argrett, Assistant Attorney General, Teresa E. McLaughlin, Edward T. Perelmuter (Argued), Annette M. Wietecha, United States Department of Justice, Tax Division, Washington, D.C., for Appellee.

Joseph J. Haspel (Argued), Stein, Riso, Haspel & Jacobs, New City, N.Y., for Appellants.

Before: MANSMANN, ROTH, and WEIS, Circuit Judges

ROTH, Circuit Judge:

This case presents a question of statutory interpretation; its facts are not disputed. The appellants, Harold and Gail Farley, are taxpayers and owners of two separate S corporations. The Farleys obtained income tax refunds from the Internal Revenue Service in late 1995 and early 1996 after filing amended tax returns for the years 1989, 1990, 1992 and 1993. They obtained these refunds after adjusting the basis of their S corporation stock upward to account for discharge of indebtedness income excluded from gross income due to the insolvency of their S corporations. By increasing the basis of their S corporation stock, the Farleys were able to take deductions for losses that had been previously suspended. The recognition of these suspended losses resulted in a reduction of the Farley's tax liability for 1989, 1990, 1992 and 1993. In addition, through the same increase in basis, the Farleys were able to take advantage of losses in 1995 resulting in an additional reduction of tax liability. The I.R.S. issued refunds, reflecting these adjustments, but later decided that the Farleys could not utilize discharge of indebtedness income to increase the basis of their S corporation stock. As a consequence, the I.R.S. concluded that the Farleys were not entitled to deductions for their suspended losses and thus were not entitled to the refunds issued in late 1995 and early 1996.

The Government subsequently brought suit in District Court to recover these re-funds. Both parties moved for summary judgment. The District Court, relying primarily on *Nelson v. Commissioner*, 110 T.C. 114, 1998 WL 66131 (1998), granted the Government's motion for summary judgment. The Farleys appeal the District Court's grant of summary judgment.

Because we find that the District Court misinterpreted the relevant statutes in disallowing the refunds obtained by the Farleys, we will reverse the grant of summary judgment and remand this case to the District Court to enter judgment in favor of the Farleys.

## I. FACTS

In 1986, the Farleys invested $200,000 and received fifty percent of the stock of two S corporations, SCI Acquisition, Inc. ("SCI") and CCI Camping Corporation ("CCI") (hereinafter referred to collectively as the "Farley S Corporations"). In 1986 and 1987, the Farley S Corporations incurred losses, which for tax purposes passed through to the Farleys. *See* 26 U.S.C. § 1366(a)(1) ("In determining the tax under this chapter of a shareholder for the shareholder's taxable year in which the taxable year of the S corporation ends ... there shall be taken into account the shareholder's pro rata share of the corporation's ... items of income (including tax-exempt income), loss, deduction, or credit the separate treatment of which could affect the liability for tax of any shareholder....").[1] As a result of these losses, by the end of the 1987 tax year, the Farleys'

---

1. The concept of "pass-through" provides to S corporation shareholders some of the advantages of a partnership. It is perhaps best summarized by the following excerpt from a recent Tenth Circuit opinion:

Subchapter S of the Internal Revenue Code, 26 U.S.C. §§ 1361–1379, permits certain corporations to elect to be taxed in a similar, but not identical, fashion as partnerships. *See* 3 Boris I. Bittker & Lawrence Lokken, Federal Taxation of Income, Estates and Gifts ¶ 95.6.1 (2d ed.1991) (highlighting major distinctions). A subchapter S corporation generally does not pay taxes as an entity. 26 U.S.C. § 1363(a). Instead, the corporation's profits and losses pass through directly to its shareholders on a pro rata basis and are then reported on the shareholders' individual tax returns. 26 U.S.C. § 1366(a). This conduit approach allows shareholders to avoid double taxation on corporate earnings. Tax integrity, meanwhile, is preserved by requiring shareholders to treat all income and deductions as if "realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation." 26 U.S.C. § 1366(b). *Gitlitz v. Commissioner*, 182 F.3d 1143, 1146 (10th Cir.1999).

S corporation stock had a zero basis.[2] From 1987 through 1992, the Farley S Corporations continued to incur losses. Because the Farleys' S corporation stock had a zero basis, the Farleys reported these losses as suspended losses on their tax returns (the "Suspended Losses"). *See* 26 U.S.C. § 1366(d)(1)(A) ("[The] aggregate amount of losses and deductions taken into account by a shareholder under [§ 1366(a)] for any taxable year shall not exceed ... the adjusted basis of the shareholder's stock in the S corporation."); 26 U.S.C. § 1366(d)(2) ("Any loss or deduction which is disallowed for any taxable year by reason of [§ 1366(d)(1)] shall be treated as incurred by the corporation in the succeeding taxable year with respect to that shareholder.").

In 1992, the Farley S Corporations ceased operating due to their continued losses, and, as a result, the Farley S Corporations' secured creditors foreclosed on the assets of SCI and CCI. All debt not satisfied by the sale of these assets was forgiven by the secured creditors, resulting in discharge of indebtedness income (also known as cancellation of debt income) to the Farley S Corporations (the "COD Income"). From this point on, the Farley S Corporations were insolvent, and, as such, the COD Income was excluded from gross income. *See* 26 U.S.C. § 108(a)(1)(B).

On or around April 15, 1990, the Farleys filed their income tax return for the 1989 tax year. The 1989 Return disclosed a tax liability of $67,507, which the Farleys paid. On or around April 15, 1991, the Farleys filed their income tax return for the 1990 tax year. The 1990 Return disclosed a tax liability of $112,553, which the Farleys paid. On or around April 15, 1993, the Farleys filed their income tax return for the 1992 tax year. The 1992 Return disclosed a tax liability of $42,936, which the Farleys paid. On or around April 15, 1994, the Farleys filed their income tax return for the 1993 tax year. The 1993 Return disclosed a tax liability of $44,748, which the Farleys paid. Finally, on or around October 11, 1996, the Farleys filed their income tax return for the 1995 tax year. The 1995 Return disclosed a tax liability of $0.

On September 1, 1995, and January 12, 1996, the Farleys filed amended tax returns for tax years 1989, 1990, 1992 and 1993 (together, the "Relevant Tax Years"). As a part of the Amended Returns, the Farleys claimed refunds for the Relevant Tax Years as follows: 1989—$67,507; 1990—$64,522; 1992—$42,936; and 1993—$44,748.

The Amended Returns were premised on an increase in the tax basis of the Farleys' S corporation stock as a consequence of COD income. Through this increase in tax basis, the Farleys were able to recognize the Suspended Losses and consequently reduced their tax liability for each of the Relevant Tax Years. In addition, through the same increase in basis, the Farleys were able to take deductions for losses in the 1995 tax year. The I.R.S. issued refunds in the amounts claimed by the Farleys (the "Relevant Refunds").

Shortly thereafter, in two undated letters (the "30 Day Letters") from Frank P. Nixon, District Director of the I.R.S., by I.R.S. Agent Robert V. Grosso, the I.R.S. proposed certain assessments. Along with the 30 Day Letters, the Farleys were provided with a series of reports authored by Grosso, which concluded that the Relevant Refunds were erroneously issued and therefore the Refund Claims were disal-

2. The tax basis of an asset, in this case the Farleys' S corporation stock, is typically the asset's cost. To determine the basis of an S corporation's stock, a taxpayer starts with the cost of the stock and increases his or her basis for corporate income and loans to the corporation. *See* 26 U.S.C. § 1367(a)(1). Similarly, the taxpayer decreases his or her basis for corporate losses and distributions by the corporation. *See* 26 U.S.C. § 1367(a)(2). It was this deduction of corporate losses from basis which had reduced the Farley's S corporation stock to zero basis.

lowed. According to the Grosso Reports, pursuant to the controlling statutes, the Farleys could not increase the tax basis of their S corporation stock even though the Farley S Corporations had discharge of indebtedness income; they could not, therefore, recognize the Suspended Losses; and ultimately they could not claim refunds for the Relevant Tax Years nor take a deduction for the losses in 1995.

The 30 Day Letters proposed tax liability as follows: 1989—$67,507; 1990—$64,522; 1992—$42,918; 1993—$44,748; and 1995—$92,980. By agreement between Grosso and the Farleys' accountant, the parties set July 31, 1997, as the last day to protest the issues raised by the 30 Day Letters. The Farleys promptly protested the assessments in the 30 Day Letters, and shortly thereafter the Government brought suit in U.S. District Court for the Western District of Pennsylvania seeking recovery of the Relevant Refunds.

In District Court, the Farleys moved for summary judgment, and the Government cross-moved for summary judgment. In their initial motion for summary judgment, the Farleys relied primarily upon *Winn v. Commissioner*, 73 T.C.M. (CCH) 3167 (1997) (*Winn I*). *Winn I* was squarely on point and supported the Farleys' position, but the Tax Court chose to re-visit the issue *en banc* in a different case, *Nelson v. Commissioner*, that presented the same question. After re-visiting the issue, the Tax Court's opinion in *Winn I* was withdrawn and superseded by a subsequent opinion issued the same day as the Tax Court's opinion in *Nelson v. Commissioner*. *See Winn v. Commissioner*, 73 T.C.M. (CCH) 3167 (1997) *withdrawn and superseded by Winn v. Commissioner*, 75 T.C.M. (CCH) 1840 (1998); *Nelson v. Commissioner*, 110 T.C. 114, 130, 1998 WL 66131 (1998). Relying on Nelson, which was affirmed by the Tenth Circuit Court of Appeals, the District Court in this case granted the Government's motion for summary judgment. *See United States v. Farley*, 99–1 U.S.T.C. P 50,370 (1999); *see*

*also Nelson v. Commissioner*, 182 F.3d 1152, 1152–53 (10th Cir.1999) ("For the same reasons outlined in our published opinion filed today in *Gitlitz v. Commissioner* ... we affirm the decision of the Tax Court."); *Gitlitz v. Commissioner*, 182 F.3d 1143, 1151 (10th Cir.1999) (holding that discharge of indebtedness income excluded from gross income under 26 U.S.C. § 108(a) does not pass through to the shareholders of an S Corporation and thus does not increase the shareholder's basis in their S corporation stock). The Farleys appeal the District Court's ruling.

## II. JURISDICTION

This action was filed by the Government pursuant to section 7405(b) of the Internal Revenue Code. Section 7405(b) of the Internal Revenue Code provides the Government with a civil cause of action to recover taxes "erroneously refunded." 26 U.S.C. S 7405(b); *see, e.g., Hutchins v. Internal Revenue Service*, 67 F.3d 40, 42 (3d Cir. 1995).

The District Court had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (1999), and we have appellate jurisdiction pursuant to 28 U.S.C. § 1291 (1999). *See* 28 U.S.C. § 1331 (1999) ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."); 28 U.S.C. § 1291 (1999) ("The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States...."). Our review of the District Court's grant of summary judgment is plenary. *See, e.g., Hurley v. Atlantic City Police Dept.*, 174 F.3d 95, 128 n. 29 (3d Cir.1999).

## III. DISCUSSION

### A. Recovery of Refunds Under Section 7405(b)

█ Before reaching the merits of the taxpayers' argument, we address the Farleys' contention that the Government can-

not sue pursuant to 26 U.S.C. § 7405(b) to recover the Relevant Refunds. Section 7405(b) states in pertinent part that "[a]ny portion of a tax imposed by this title which has been erroneously refunded ... may be recovered by civil action brought in the name of the United States." 26 U.S.C. § 7405(b). Noting that "[t]here has never been any assertion that [the Relevant Refunds] were mistakenly issued," the Farleys argue that the Relevant Refunds were not "erroneously refunded" within the meaning of the statute and that the Government therefore cannot sue to recover the Relevant Refunds pursuant to section 7405(b). Instead, the Farleys contend, the Government must proceed under 26 U.S.C. § 6212 to recover the Relevant Refunds. The Farleys argue that "[t]he facts of this case are squarely on point with the facts of *United States v. Russell Mfg. Co.*, 349 F.2d 13 (2d Cir.1965)," and as such the Government is precluded by the holding in *Russell* from suing to recover the Relevant Refunds pursuant to 26 U.S.C. § 7405(b). While the Farleys' argument is not entirely without merit, we conclude that the Government can bring suit pursuant to section 7405(b) to recover the Relevant Refunds. In addition, while we are obviously not bound by Second Circuit precedent, it is important to note that even if we were to adopt the reasoning of the *Russell* court, the Farleys' argument still fails because the facts of this case are not "squarely on point with the facts of" *Russell.*

The controversy that gave rise to *United States v. Russell Mfg. Co.* began in 1945 when Russell Manufacturing Company took a $47,200 deduction for payments made to two separate trusts. *Russell*, 349 F.2d at 15. The Commissioner of Internal Revenue disallowed the deduction, concluding that:

> [The] payments were not pursuant to a "qualified" plan under § 23(p)(1)(A), (B) and (C) of the 1939 Code ... and that they did not meet the requirement of § 23(p)(1)(D) which permits deductions

of payments under a non-qualified plan "if the employees' rights to or derived from such employer's contribution or such compensation are nonforfeitable at the time the contribution or compensation is paid."

*Id.* Upon denial of the refund claim, Russell Manufacturing sued in the Court of Claims and ultimately prevailed. *See Russell Mfg. Co. v. United States*, 146 Ct.Cl. 833, 175 F.Supp. 159, 163 (Ct.Cl.1959).

After prevailing in the Court of Claims, Russell Manufacturing continued to claim similar refunds for many years. The I.R.S. issued these refunds but decided in 1964 to bring suit in the District Court pursuant to section 7405(b) to recover the refunds, alleging that the refunds had been issued erroneously. *See United States v. Russell Mfg. Co.*, 245 F.Supp. 159 (D.Conn.1964). The District Court dismissed the Government's claim, concluding that the Government could not sue under section 7405(b) because the money claimed by the Government had not been "erroneously refunded." *See id.* at 160. The Government promptly appealed the District Court's ruling, and the Second Circuit affirmed, concluding that the Government could not sue pursuant to section 7405(b). *See Russell*, 349 F.2d at 19. The facts of *Russell*, however, differ dramatically from the facts in this case.

Unlike this case, in *Russell*, the Government "candidly" admitted that "[i]ts aim [was] to obtain a decision by [the Second Circuit Court of Appeals] conflicting with that of the Court of Claims, as to which Russell might well obtain certiorari under Supreme Court Rule 19, subd. 1(b), and thus to procure an authoritative construction, hopefully in the Government's favor." *Russell*, 349 F.2d at 16. In addition, unlike this case, the parties in *Russell* were the same in the Court of Claims as in the Court of Appeals. In arguing that the facts of this case are "squarely on point with the facts of *United States v. Russell Manufacturing Co.*, 349 F.2d 13 (2nd Cir. 1965)," the Farleys analogize the earlier

Court of Claims decision in *Russell* to the Tax Court's initial decision in *Winn v. Commissioner*. In *Russell*, the taxpayer in the Court of Claims and the Second Circuit Court of Appeals was the same— Russell Manufacturing Company. In contrast, the taxpayers in *United States v. Farley* (Third Circuit Court of Appeals) and *Winn v. Commissioner* (Tax Court) were clearly different. The final and perhaps most important point is that the court in *Russell* explicitly limited its holding to the facts of that case stating, "[w]e limit our decision to the unusual facts here presented, where the Government *deliberately* made what it then considered an erroneous refund to a taxpayer prevailing in a court decision whose authority remains unimpaired." *Russell*, 349 F.2d at 17–18 (emphasis added). The Farleys' reliance on *Russell* is misplaced; *Russell* is inapposite because the Government in this case did not change its treatment of tax refunds in order to prompt litigation.

Indeed, this case is more appropriately analogized to *United States v. Ellis*, 154 F.Supp. 32 (S.D.N.Y.1957), *aff'd.* 264 F.2d 325 (2d Cir.1959), *United States v. Heilbroner*, 22 F.Supp. 368 (S.D.N.Y.1938) *aff'd.* 100 F.2d 379 (2d Cir.1938), or *United States v. Tuthill Spring Co.*, 55 F.2d 415 (N.D.Ill.1931) in which the I.R.S. changed its interpretation of the substantive law. However, unlike *Russell*, in *Ellis*, *Heilbroner*, and *Tuthill*, the court held that the Government could sue under the predecessor of § 7405(b) to recover refunds erroneously issued. As such, we conclude that the Government can bring this suit under § 7405(b) of the Internal Revenue Code in an effort to recover the Relevant Refunds.

### B. The Pass Through of the Discharge of Indebtedness Income

Turning to the merits of the Farleys' appeal, we focus first on the statutory language of the Internal Revenue Code. Section 61(a)(12) of the Internal Revenue Code states in relevant part, "[e]xcept as otherwise provided in this subtitle, gross income means all income from whatever source derived, including ... [i]ncome from discharge of indebtedness." 26 U.S.C. § 61(a)(12). This background rule, that discharge of indebtedness income is income, does not apply to insolvent taxpayers. Specifically, section 108(a)(1)(B) of the Internal Revenue Code states that "gross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayer if ... the discharge occurs when the taxpayer is insolvent." 26 U.S.C. § 108(a)(1)(B).

The exclusion of discharge of indebtedness income from gross income provided for in section 108(a)(1)(B) is not without a price. A taxpayer excluding discharge of indebtedness income from gross income must make corresponding reductions in certain tax attributes, attributes that might otherwise yield future tax benefits. Pursuant to section 108(b)(1) of the Internal Revenue Code, "[t]he amount excluded from gross income under [§ 108(a)(1)(b) ] shall be applied to reduce tax attributes of the taxpayer as provided in [§ 108(b)(2) ]." 26 U.S.C. § 108(b)(1). Discharge of indebtedness income is thus offset against the various "tax attributes" listed in section 108(b)(2)—net operating losses, general business credits, minimum tax credits, capital loss carryovers, basis (to the extent permitted under Section 1017(b) of the Internal Revenue Code), passive activity loss and credit carryovers, and foreign tax credit carryovers. See 26 U.S.C. § 108(b)(2)(A)-(G).[3]

In challenging the District Court's grant of summary judgment, the Farleys argue

---

3. The parties in this case do not dispute that an S corporation can have only two of the tax attributes listed in section 108(b)(2)—the basis of the S corporation's assets and section 1366(d)(1) losses, which are considered net operating losses under section 108(d)(7)(B) and as such are subject to reduction pursuant to section 108(b)(2)(A). *See* 26 U.S.C. § 108(d)(7)(B) ("In the case of an S corporation, for purposes of [§ 108(b)(2)(A) ], any loss

that discharge of indebtedness income excluded from gross income under 26 U.S.C. § 108(a) passes through to the shareholders of an S corporation on a pro rata basis pursuant to section 1366 of the Internal Revenue Code. As support for this argument, the Farleys cite section 1366(a)(1)(A) of the Internal Revenue Code, which states that the determination of an S corporation's shareholder's tax liability for the shareholder's tax year during which the S corporation's tax year ends takes into account the shareholder's pro rata share of the S corporation's "items of income (including tax exempt income), loss, deduction, or credit, the separate treatment of which could affect the liability for tax of any shareholder." 26 U.S.C. § 1366(a)(1)(A). The Farleys also cite section 1366(c) of the Internal Revenue Code, which states that "in any case where it is necessary to determine the gross income of a shareholder for purposes of this title, such gross income shall include the shareholder's pro rata share of the gross income of the corporation." 26 U.S.C. § 1366(c).

The Farleys further argue that discharge of indebtedness income, after passing through to the shareholders of the S corporation pursuant to section 1366, increases the basis of the shareholders' stock pursuant to section 1367. Specifically, under section 1367(a)(1)(A), an S corporation's shareholder's basis in the stock of the corporation is increased for any period by, *inter alia*, items of income described in section 1366(a)(1)(A). See 26 U.S.C. § 1367(a)(1)(A). As section 1367(a)(1)(A) states, "[t]he basis of each shareholder's stock in an S corporation shall be increased for any period by the sum of the following items determined with respect to that shareholder for such period: the items of income described in subparagraph (A) of section 1366(a)(1) . . . ." 26 U.S.C. § 1367(a)(1)(A).

As the preceding discussion demonstrates, the key to unraveling this case is understanding how the relevant statutory provisions interact. As discussed above, section 1366, which describes how and when income, losses, deductions and credits pass through to S corporation shareholders, and section 1367, which sets forth the framework for increasing and decreasing the basis of S corporation stock, must be read in conjunction with the section 108.

As mentioned above, section 108(a)(1) provides that "[g]ross income does not include any amount which (but for this subsection) would be includible in gross income by reason of the discharge (in whole or in part) of indebtedness of the taxpayers if . . . the discharge occurs when the taxpayer is insolvent." 26 U.S.C. § 108(a)(1). It is not disputed that the Farley S Corporations were insolvent at the time of the discharge of indebtedness. And as discussed above, discharge of indebtedness income excluded from gross income pursuant to section 108(b) offsets various tax attributes listed in section 108(b)(2). Pursuant to section 108(b)(4)(A), the reduction in tax attributes mandated by section 108(b)(2) is made after the determination of the tax imposed on the taxpayer (the S corporation shareholder) for the year of discharge. *See* 26 U.S.C. § 108(b)(4)(A) ("The reduction made in [§ 108(b)(2) ] shall be made after the determination of the tax imposed by this chapter for the taxable year of the discharge.") (emphasis added). Furthermore, pursuant to section 108(d)(7)(A), discharge of indebtedness income exclusions (section 108(a)) and tax attribute reduction principles (section 108(b)) must be applied at the corporate level. *See* 26 U.S.C. § 108(d)(7)(A) ("In the case of an S corporation, [§ 108(a) and § 108(b) ] shall be applied at the corporate level.").

---

or deduction which is disallowed for the taxable year of the discharge under section 1366(d)(1) shall be treated as a net operating loss for such taxable year."). All other "tax

attributes" listed in section 108(b)(2)(A)-(G) pass through to S corporation shareholders pursuant to section 1366(a)(1).

■ The ultimate disposition of this case hinges on the interaction of section 108(d)(7)(A) with section 108(b)(4)(A). Section 108(d)(7)(A), which states that the discharge of indebtedness income exclusion and tax attribute reduction principles should be applied at the corporate level, has two primary effects. First, section 108(d)(7)(A) requires the solvency determination in section 108(a)(1)(b) to be made at the corporate level. That is, when determining whether the "taxpayer is insolvent," and thus whether discharge of indebtedness income is excluded from gross income, one must determine whether the S corporation itself is insolvent, not whether a specific individual shareholder is insolvent. Second, and more importantly, section 108(d)(7)(A) requires that the tax attribute reduction principles set forth in section 108(b) be applied at the corporate level. That is, when reducing tax attributes as required by section 108(b), discharge of indebtedness income excluded from gross income pursuant to section 108(a)(1)(A) shall be applied to reduce the

tax attributes of the corporation, rather than the individual shareholder.

Section 108(b)(4)(A) states that "[t]he reductions described in [section 108(b)(2) ] shall be made *after* the determination of the tax imposed by this chapter for the taxable year of the discharge." 26 U.S.C. § 108(b)(4)(A) (emphasis added). As the Tenth Circuit observed in *Gitlitz*:

> The outcome of this case is ultimately determined by the timing of the pass-through. If the attribute reduction procedures precede the pass-through, the corporation's excluded discharge of indebtedness income is absorbed before it can pass through to shareholders and compel basis adjustments.... If, on the other hand, attribute reduction takes place after the pass-through, the taxpayers' theory must prevail.

*Gitlitz v. Commissioner*, 182 F.3d 1143, 1148 (10th Cir.1999).[4]

The language in section 108(b)(4)(A) clearly indicates that tax attributes are reduced on the first day of the tax year *following* the year of the discharge of in-

**4.** Contrary to our holding today, in *Gitlitz*, the Tenth Circuit held that COD income excluded from gross income under section 108 did not pass through to the S corporation's shareholders and therefore did not increase the basis of their S corporation stock. *See Gitlitz*, 182 F.3d at 1151. The Tenth Circuit concluded that the timing of pass-through under section 1366 ultimately determined the outcome of the appeal. *See id.* at 1148. The court further concluded that attribute reduction under section 108(b) preceded the pass-through of excluded COD income and, as such, the S corporation's COD income was absorbed before it could pass through to the shareholders and increase the basis of their S corporation stock. *See id.* According to the Court, this construction avoided potential windfalls. *See id.* at 1148–49.

The court in *Gitlitz* had difficulty determining the role of section 108(b)(4)(A) in the tax calculation and ultimately concluded that section 108(b)(4)(A) was simply designed to compute certain tax applications (such as establishing ceilings for deductions and credits under section 108(b)(2), charitable contribution limits, alternative minimum tax liability, etc.) before reducing tax attributes. *See id.* at

1150. Thus, the court did not read the statute as mandating attribute reductions in the tax year following the year of the discharge. *See id.* However, the Tenth Circuit conceded that if it read section 108(b)(4) narrowly and in isolation, the taxpayers' argument was plausible, that is, that Congress intended tax attributes to be reduced only in the tax year following the taxable year of the discharge. *See id.* The court refused to do so, however, finding that it was required to read the Internal Revenue Code as a whole, so as not to " 'defeat the object intended to be accomplished.' " *Id.* (citation omitted). Thus, the court concluded that the taxpayers' interpretation of section 108(b)(4)(A) would negate the effect of the tax attribution scheme and result in an unwarranted windfall to the taxpayers. *See id.*

The Tenth Circuit's interpretation of section 108(b)(4)(A) in *Gitlitz* ignores the plain meaning of the statute. Because we find that the language of section 108(b)(4)(A) is clear and unambiguous, we decline to follow the Tenth Circuit's holding in *Gitlitz* and hold that COD income excluded from gross income under section 108 passes through to the S corporation's shareholders, increasing the basis of their S corporation stock.

debtedness. The statutory language is unambiguous, and the operation of the statutory language is straightforward. Discharge of indebtedness income, considered income under section 61(a)(12), is excluded from gross income pursuant to section 108(a)(1)(B) if, as in this case, the S corporation is insolvent. This solvency determination is made at the corporate level rather than the individual shareholder level pursuant to section 108(d)(7)(A). Discharge of indebtedness income excluded from gross income under section 108(a)(1)(B) then passes through to the S corporation's shareholders pursuant to section 1366(a)(1)(A). Upon passing through to the S corporation shareholders, the discharge of indebtedness income causes an upward adjustment in the basis of the shareholders' S corporation stock pursuant to section 1367(a)(1)(A), thus allowing deductions for losses previously suspended because the corporation's stock lacked adequate basis. Finally, the tax attribute reduction required by section 108(b) takes place on the first day of the tax year following the year of the discharge of indebtedness, as mandated by section 108(b)(4)(A).

We hold that because the controlling statutes clearly provide that tax attribute reduction takes place after income has passed through the S corporation to its shareholders (pass through being a neces-sary prerequisite to "determin[ing] the tax imposed by this chapter for the taxable year of discharge"), in the case of an insolvent S corporation, discharge of indebtedness income that is excluded from gross income by section 108(a), passes through to the shareholders, increases the shareholder's basis in their S corporation stock, thus allowing the shareholders to take deductions for S corporation losses suspended under section 1366(d)(1). As such, the Farleys were entitled not only to increase the basis of their S corporation stock but also to take deductions for the Suspended Losses.

## C. The Government's Contentions

While we hold that the District Court erred in disallowing the Relevant Refunds, we will address some of the arguments advanced by the Government in their brief and at oral argument. The Government initially argues that the District Court's grant of summary judgment was appropriate because a contrary holding would provide the Farleys with "unwarranted double tax benefits," an unjustified tax "windfall," or a tax benefit not "intended" by the statute. Although one could argue that the outcome mandated by the statutory language was not the outcome intended by Congress, we have nevertheless found that the statutory language is clear and unambiguous.[5] Moreover, other than *Gitlitz*, the Government cites no case to support its

---

5. The term "unwarranted" or "unjustified" is used in the sense that the taxpayers have not borne any economic outlay for the tax benefit of their basis increase. Although tax policy generally dictates that a taxpayer is only entitled to an increase in basis for his investment of after-tax dollars, numerous exceptions to that rule exist. See James D. Lockhart and James E. Duffy, *Tax Court Rules in Nelson That S Corporation Excluded COD Income Does Not Increase Shareholder Stock Basis*, 10 J. S Corporation Tax'n 256 (Winter 1999), *reprinted in* 25 Wm. Mitchell L. Rev. 287, 303 (1999). For example, under sections 101 and 103 of the Internal Revenue Code, tax-exempt income derived from certain life insurance contracts and state and local bonds purchased by an S corporation is passed through to shareholders under sections 1366 and 1367 thus producing an increase in the basis of the S corporation's stock without any direct economic outlay by the shareholder. *See* James D. Lockhart and James E. Duffy, *Tax Court Rules in Nelson That S Corporation Excluded COD Income Does Not Increase Shareholder Stock Basis*, 25 Wm. Mitchell L. Rev. 287, 303–04 (1999). Since Congress has seen fit to allow "unwarranted" tax benefits under sections 101 and 103, and since the statutory language in section 108 (with respect to COD income excluded from gross income) is identical to that in sections 101 and 103, section 108 cannot be distinguished from sections 101 and 103 on the basis of economic outlay considerations. *See id.* at 306. Nonetheless, to the extent that application of the relevant statutes results in a "perceived unwarranted windfall, principles of judicial restraint dictate that the statute be applied as written unless such application would create an ab-

assertion that if the Farleys prevail, they will receive *"unwarranted* double tax benefits" or an *unjustified* tax "windfall." In addition, the Government presents scant evidence that a decision in favor of the taxpayers would provide them with a tax benefit not intended by Congress. With the exception of the legislative history of the Omnibus Budget Reconciliation Act, which we discuss *infra*, the Government's initial argument finds little support in the case law or elsewhere.

The Government next argues that the taxpayers' argument is flawed because "it effectively reads sections 108(b)(2)(A) and 108(d)(7)(B)—which require excluded discharge of indebtedness income to reduce S corporation net operating losses for the taxable year of discharge—out of the Code." In support of this proposition, the Government cites *Gitlitz* in which the court stated that the "[t]axpayers' interpretation of § 108(b)(4)(A) would negate the effect of the tax attribution scheme and would give taxpayers an unwarranted windfall." *Gitlitz*, 182 F.3d at 1150. The Government's argument is, however, flawed. Nothing in section 108(d)(7)(B) "require[s] excluded discharge of indebtedness income to reduce S corporation net operating losses for the taxable year of discharge;" in fact, nothing in section 108(d)(7)(B) even suggests such a conclusion. Section 108(d)(7)(B) states:

> In the case of an S corporation, for purposes of subparagraph (A) of subsection (b)(2), any loss or deduction which is disallowed for the taxable year of the discharge under section 1366(d)(1) shall be treated as a net operating loss for such taxable year. The preceding sentence shall not apply to any discharge to the extent that subsection (a)(1)(D) applies to such discharge.

26 U.S.C. § 108(d)(7)(B).

As we see from this language, section 108(d)(7)(B) does state that losses or deductions disallowed in the taxable year of discharge pursuant to section 1366(d)(1) must be considered net operating losses for the year of taxable discharge pursuant to section 108(b)(2)(D). However, nowhere does section 108(d)(7)(B) indicate that S corporation discharge of indebtedness income should *reduce* such net operating losses *"for the taxable year of discharge."* While this conclusion is an integral part of the Government's argument, it finds no support in the language of the statute.

As a corollary to the above argument, the Government suggests that because S corporations do not have most of the tax attributes listed in section 108(b)(2) (for example, general business credits, minimum tax credits, or capital loss carryovers), the Farleys' interpretation of section 108(b)(4)(A) negates the effect of the tax attribute reduction scheme detailed in section 108(a)-(b). This argument misses the mark for two reasons.

First, section 108(a)-(b) is not specific to S corporations; it applies to partnerships and C corporations as well. As such, even if section 108(b)(2) is superfluous in part with respect to S corporations, it does not imply that the entire tax attribute scheme set forth in section 108(a)-(b) is negated by the Farleys' interpretation of section 108(b)(4)(A). Even though some parts of section 108(a)-(b) are inapplicable to S corporations, these parts may be applicable to C corporations or partnerships.

Second, S corporations typically do have at least one of the tax attributes listed in 108(b)(2), mainly basis in the S corporation's assets. Thus, the tax attribute reduction scheme set forth in section 108(a)-(b) is not negated by the Farleys' interpretation of section 108(b)(4)(A), but rather is

surd result." *See id.* (citing *Exxon Corp. v. Commissioner*, 102 T.C. 721, 727–28, 1994 WL 243435 (1994)). Even the Tenth Circuit in *Gitlitz*, which concluded that Congress did not intend to grant the taxpayers the equiva-

lent of a double deduction and ultimately held for the Government on facts virtually identical to those presented here, acknowledged that the "taxpayer's argument [wa]s not without merit." *Gitlitz*, 182 F.3d at 1148.

implemented by reducing the basis of an S corporation's assets. The Government counters by noting that under section 1017(b)(2), basis cannot be reduced below the debt secured by the assets. While this is true, and while an insolvent S corporation may likely have incurred as much secured debt as possible (thus leaving no basis above the amount of debt secured by its assets to be reduced), it is certainly possible for an S corporation to incur enough *unsecured* debt to become insolvent, while maintaining basis in its assets above the amount of debt secured by those assets. In such a situation, discharge of indebtedness income would reduce the basis of the S corporation's assets pursuant to sections 108(b)(2) and 108(b)(4)(A) on the first day of the tax year following the year of the discharge of indebtedness. Thus, to quote United States v. Nordic Village, Inc., it is possible to construe the statute "in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992); cf. Brief for Appellee at 41, *United States v. Farley*, No. 99–3209 (citing *Nordic Village* as support for the proposition that "a statute must, if possible, be construed in such fashion that every word has some operative effect").

The Government next argues that when section 1366(a)(1)(A) is read in conjunction with section 108(d)(7)(A), it is clear that discharge of indebtedness income does not pass through to the shareholders of an S corporation. The Government contends that "section 108 of the Code bars taxpayers from receiving deductions for their suspended losses." The Government argues (consistent with the Tenth Circuit's holding in *Gitlitz*) that when discharge of an S corporation's indebtedness is excluded from income due to the S corporation's insolvency, the shareholder's pro rata share of the discharge of indebt-

edness income does not pass through to the shareholders but rather is either completely absorbed by the S corporation's net operating losses or, if not completely absorbed, is disregarded. Specifically, the Government argues that section 1366(b), which requires that "the character of an item passed through under section 1366(a)(1)(A) is determined as if realized 'directly from the source from which realized by the corporation' . . . cannot be applied to an item of income that is excludable at the corporate level." This argument, however, also misses the mark. It is not disputed that tax attributes are reduced at the corporate level; the question is when the reduction occurs. If the reduction occurs after the pass through of discharge of indebtedness income, as the Farleys argue and as the language of section 108(b)(4)(A) requires, then the shareholders of an S corporation can adjust their basis upward and deduct otherwise undeductible loses.

To bolster its argument, however, the Government refers to section 1366(b)[6] and quotes the Tax Court's opinion in *Nelson v. Commissioner*, in which Judge Beghe stated: "Section 1366(b) refutes [the taxpayer's] pass through interpretation of section 108(d)(7)(A). There's no way, actually or fictively, in which the equivalence rule of section 1366(b) could apply to a solvent shareholder of an insolvent S corporation." *Nelson*, 110 T.C. 114, 131–32, 1998 WL 66131 (Beghe, J., concurring) (1998). This statement, made without elaboration by Judge Beghe, is simply incorrect. Section 1366(b) can and does apply and does so "fictively" as required by the statute. *See* 26 U.S.C. § 1366(b) ("The character of any item included in a shareholder's pro rata share under paragraph (1) of subsection (a) shall be determined *as if* such item were realized directly from the source from which realized by the cor-

---

**6.** Section 1366(b) provides that the character of each tax "item" in section 1366(a)(1)(A) is determined as if it were realized directly from the source from which the S corporation real-

ized it or incurred in the same manner as incurred by the S corporation. *See* 26 U.S.C. § 1366(b).

poration, or incurred in the same manner as incurred by the corporation.") (emphasis added).

The Government next argues that the "[t]axpayer's construction of the Code" places section 108(d)(7)(A) in conflict with section 1366(b). According to the Government, "[i]n the case of discharge of indebtedness income realized by an insolvent S corporation with a solvent shareholder," a situation that is fairly common and almost certainly was envisioned by Congress, "section 108(d)(7)(A) would mandate that the income would be excludable from gross income, while section 1366(b) would mandate that the income ·would be ·taxable." Once more, however, the Government's argument is flawed. Section 1366(b) deals with the character of income which has been passed through to the shareholder, while section 108(d)(7)(A) deals with the application of the discharge of indebtedness income exclusion requirement and tax attribute reduction scheme detailed in sections 108(a)-(b). These two statutory provisions address different issues at different levels.

The Government goes on to argue that "[t]he double tax benefit advocated by taxpayers in this case . . . is [ ] fundamentally at odds with the structure of Subchapter S." The Government argues that no other type of income (taxable or tax-exempt) realized by an S corporation results in the double tax benefit argued for by the Farleys. As mentioned earlier, sections 101 and 103, in conjunction with sections 1366 and 1367, generate tax-exempt income that results in an apparent "double tax benefit" for S corporation shareholders. *See supra* note 5. Even if the Government's argument were correct, it does not provide us with the freedom to ignore the unambiguous statutory language.

Both the taxpayers and the Government argue extensively about whether, in the case of an insolvent S corporation, discharge of indebtedness (or COD) income is tax-exempt income. It is beyond dispute that discharge of indebtedness income of an insolvent S corporation is "income" under section 1366. The taxpayers argue that discharge of indebtedness income is tax-exempt income while the Government argues that discharge of indebtedness income is not tax-exempt income but rather tax-deferred income. The taxpayers in making their argument rely on the legislative history of the Subchapter S Revision Act of 1982, which states with respect to section 1366:

> The following examples illustrate the operation of the bill's pass-through rules. . . . Tax exempt·interest will pass through to the shareholders as such and will increase the shareholders' basis in their subchapter S stock. Subsequent distributions will not result in taxation of the tax-exempt income.

S.Rep. No. 97–640, at 16 (1982).[7]

However, this disagreement between the Government and the Farleys as to the nature of discharge of indebtedness income has little relevance. As Judge Beghe correctly noted in his concurrence in *Nelson*:

> No extended exegesis to determine the character of COD [Income] of an insolvent S corporation as "tax-exempt income," or as "deferred income," or as an unrealized "tax nothing" is needed. . . . The only relevant inquiry under section 1366 is not whether COD excluded from gross income of an insolvent S corporation is· "tax-exempt income," but whether it's a pass through item at all.

*Nelson v. Commissioner*, 110 T.C. 114, 130, 134, 1998 WL 66131 (1998) (Beghe, J., concurring); *cf. Gitlitz v. Commissioner*, 182 F.3d 1143, 1151 n. 7 (10th Cir.1999) ("We assume here that excluded discharge of indebtedness is tax-exempt income.").

The statute is clear—all income, tax-exempt or otherwise, passes through to the shareholders of an S corporation pursuant to section 1366(a)(1)(A). In the case

---

**7.** It is undisputed that if discharge of indebtedness income is treated like tax-exempt interest, the taxpayers must prevail. *See* S.Rep. No. 97–640, at 16 (1982).

of an insolvent S corporation, discharge of indebtedness income that is excluded from gross income by section 108(a) increases the shareholder's basis in their S corporation stock after it passes through to the shareholders of the corporation. This allows shareholders to take deductions for S corporation losses previously suspended under section 1366(d)(1).

The Government's argument, that discharge of indebtedness income is not tax-exempt income but rather tax-deferred income, is not without merit. However, beyond citing one Senate Report that suggests Congress intended to defer taxes on discharge of indebtedness income, the Government's argument is not compelling. See S.Rep. No. 96–1035, 96th Cong. 2d Sess. 2, 1980–2 C.B. 620, at 625 ("[T]he rules of the bill are intended to carry out the Congressional intent of deferring, but eventually collecting within a reasonable period, tax on ordinary income realized from debt discharge."). Ultimately, the Government argues that since discharge of indebtedness income is sometimes deferred, it should always be considered tax-deferred income. This argument suffers from one critical weakness—as the Government concedes, discharge of indebtedness income is sometimes tax-exempt.[8] If discharge of indebtedness income is sometimes tax-exempt income and sometimes tax-deferred income, it is hard to see how the Government concludes, without more support for its position, that discharge of indebtedness income is simply tax-deferred income.

The parties in this case also devote a substantial amount of time to analyzing the legislative history of various statutory provisions. Delving into the legislative history is unnecessary because the statutes' language is unambiguous. Further-more, the available legislative history either conflicts with or does not directly address the question presented in this case. While the legislative history is as a whole unhelpful, we briefly address two pieces of legislative history which do bear on the issue now before us.

The legislative history of the Subchapter S Revision Act of 1982, in providing examples of pass-through, states with respect to section 1366 that:

> Tax exempt interest will pass through to the shareholders as such and will increase the shareholder's basis in their subchapter S stock. Subsequent distributions by a corporation will not result in taxation of tax-exempt income.

S.Rep. No. 97–640, at 16 (1982). The legislative history of the Subchapter S Revision Act goes on to state that, with respect to section 1367, "both taxable and not taxable income and deductible and nondeductible expenses will serve, respectively, to increase and decrease a subchapter S shareholder's basis in the stock of the corporation." *Id.* at 18.[9] Put simply, discharge of indebtedness income, if treated like tax-exempt interest, passes through to the shareholders of an S corporation and increases the shareholder's basis in the stock. And as the Tenth Circuit in *Gitlitz* concluded:

> The Commissioner's protestations notwithstanding, we discern no intent by Congress to treat certain subchapter S corporation income at the corporate level while treating other income at the shareholder level. Such a scheme would fundamentally alter the manner in which subchapter S corporations are taxed. Section 1366(a)(1) makes clear that all items of income are attributed initially to the corporation. Because the sub-

---

8. Even under the Government's theory, if discharge of indebtedness income for a given taxable year is greater than suspended losses/net operating losses, the amount by which discharge of indebtedness income exceeds suspended losses/net operating losses is disregarded and thus is tax-exempt.

9. Unlike section 1366(a)(1)(A) which references tax-exempt income, the legislative history cited above references taxable and nontaxable income, thus encompassing both tax-exempt and tax-deferred income.

chapter S corporation is not a tax-paying entity, however, the items must pass through to shareholders unless they are absorbed by tax attribute reductions.

*Gitlitz,* 182 F.3d at 1148. As such, the Senate Report quoted above provides persuasive support for the Farleys' argument.

Also relevant is the legislative history of the Omnibus Budget Reconciliation Act of 1993, in which Congress extended the section 108 discharge of indebtedness exclusion to income from the discharge of "qualified real property business indebtedness." 26 U.S.C. § 108(a)(1)(D). The House Report on the Omnibus Budget Reconciliation Act explains in detail the effect of qualified real property business indebtedness on a shareholder's basis in the stock of an S corporation:

> In applying this provision to income from the discharge of indebtedness of an S corporation ... the exclusion and basis reduction are both made at the S corporation level (sec.108(d)(7)). *The shareholders' basis in their stock is not adjusted by the amount of debt discharge income that is excluded at the corporate level.* As a result of these rules, if an amount is excluded from the income of an S corporation under this provision, the income flowing through to the shareholders will be reduced (compared to what the shareholders' income would have been without the exclusion). Where the reduced basis in the corporation's depreciable property later results in additional income (or a smaller loss) to the corporation because of reduced depreciation or additional gain (or smaller loss) on disposition of the property, the additional income (or smaller loss) will flow through to the shareholders at that time, and will then result in a larger increase (or smaller reduction) in the shareholder's basis than if this provision had not previously applied. Thus, the provision simply defers income to the shareholders.

H.R.Rep. No. 103–111, at 624–25 (1993) *reprinted in* 1993 U.S.C.C.A.N. 378, 855–56.

The language in the legislative history could be interpreted, as the Government suggests, to mean that discharge of indebtedness income does not pass through to shareholders of an S corporation and therefore does not allow shareholders to increase the basis of their S corporation stock. As one commentator has noted, however, "[w]ere this interpretation applied to all discharges of debt (and not just discharges under Section 108(a)(1)(D)), it could be viewed as a change in pre-existing law." Richard M. Lipton, *IRS Challenges S Corporation Basis Increase for COD Income*, 81 J. Tax'n 340, 344 (Dec.1994). When the Internal Revenue Service first addressed this issue in TAM 9423003 (Feb. 28, 1994), which was issued many months after the enactment of the 1993 legislation, it made no mention of the legislative history cited above. *See id.* If the Internal Revenue Service really viewed the language in section 108(a)(1)(D) as a change in pre-existing law, certainly it would have taken that position in TAM 9423003. Its failure to do so is telltale.

Moreover, we find significance in the fact that Congress, in enacting the 1993 legislation, did not make any changes to sections 1366 and 1367. Thus, a plausible interpretation of the legislative history of section 108(a)(1)(D) is that it "applies solely for purposes of an S corporation's election to exclude COD income on the discharge of qualified real property business indebtedness—by its terms, it does not apply to discharges of other types of debt." Richard M. Lipton, *IRS Challenges S Corporation Basis Increase for COD Income*, 81 J. Tax'n 340, 344 (Dec.1994). It seems unlikely, therefore, that Congress, by commenting on the application of one section of the Internal Revenue Code (section 108), intended to determine how basis adjustments are made under another section (Subchapter S), especially where the language of the legislative history is inconsistent with the plain meaning of the statute.

Together, these two conflicting pieces of legislative history are the only ones that directly address the issue presented in this case. Ultimately, as the Tenth Circuit Court of Appeals observed, the legislative history is "largely unhelpful." *Gitlitz*, 182 F.3d at 1148. Although many other pieces of legislative history are cited by the Government, the Farleys, and commentators writing on this subject, the legislative history as a whole conflicts and provides little insight. And, as discussed earlier, the legislative history is unnecessary and irrelevant to our holding here—the statutory language is clear and unambiguous.

## IV. Conclusion

Because we conclude that the District Court ignored the unambiguous language of the controlling statutes in granting the Government's motion for summary judgment, we will reverse the District Court's grant of summary judgment[10] and remand the case to the District Court to enter judgment in favor of the Farleys.

---

**10.** We are aware that the result reached today in interpreting the relevant statutory language may not have been the result intended by Congress. However, we are not free to disregard the clear and unambiguous language of the controlling statutes. It is the function of this court to interpret the statutory language as written. If policy considerations suggest that the Code should be amended, Congress can do so. We may not.